Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues for unpaid tuition in the amount of $18,-969.11, claimed to be due him under a contract dated October 19,1951, for the training of veterans in radio broadcasting and as radio technicians, under the provisions of P. L. 16 and P. L. 346,78th Congress,[1] commonly referred to as the G. I. Bill. This contract terminated in October 1952, but the school continued to give the students instruction until they completed their courses in March 1953. Defendant does not deny that the amount claimed was due under the contract as written, nor does it contest the amount claimed from October 1952 to March 1953, but says that the cost data furnished by plaintiff, on which the rate of tuition was based, was erroneous. It seeks a reduction in the tuition rate on this contract and counterclaims for amounts it alleges were overpaid on prior contracts.
Its defense to the suit on this contract and also the counterclaims are based upon the allegations: First, that the plaintiff [2] submitted erroneous cost data in negotiating the tuition rates provided in prior contracts, which were carried forward in the one sued on, in that he did not allocate certain school operating costs to his advertising business, partially conducted by him from the school premises; Second, that in negotiating the tuition rate for the radio technical course plaintiff claimed an allowance for salary for instruction by plaintiff personally, although he did not in fact teach the course; and Third, that students enrolled in separate courses were improperly mingled or mixed together in the same classroom under a common instructor, and that a lesser quantum of instruction was thereby given than what was billed and paid for. The alleged overcharges resulting from the first and second counterclaims total $50,868.74, and from the third counterclaim, $45,876.95. Defendant would offset *171 these amounts against what it says is the proper amount due on the present contract.
Plaintiff is entitled to recover on the contract, unless he fraudulently misrepresented the facts on which the contract was based.
Plaintiff has been engaged in the training of veteran students in radio broadcasting since September 1946 in Portland, Oregon. Under a series of contracts with the Veterans Administration, veterans have been trained at hourly rates and payment has been received therefor upon submission of vouchers as provided in the contracts. Before actual cost experience had been established, the contract rate of tuition was based, in part, upon costs as estimated by plaintiff. Thereafter, rates were negotiated, based in large part upon actual cost experience as certified by plaintiff. Officers of the Veterans Administration reviewed the cost data, made adjustments where necessary to conform to regulations or as a result of audits or conferences with plaintiff, and then arrived at what was considered a “fair and reasonable” rate of compensation, as required by law. In 1949 the rates of tuition for courses which had been under contract for at least two previous years became fixed as the “customary cost of tuition” pursuant to P. L. 266, 63 Stat. 631, 652-653. It was thereafter unnecessary for plaintiff to submit cost data, except in connection with certain technical courses, which were first instituted in 1949.
Some time after May 1952 defendant refused to honor any vouchers submitted by plaintiff on the ground that over-payments had been made. It is for payments accruing under the contract for the period after payments were stopped until courses were completed that plaintiff brings this action.
Defendant says that the cost data furnished by plaintiff for fixing tuition rates on prior contracts, which prior contracts determined the tuition rate in the contract sued on, was false in the respects set out above, to wit: first, that there was included therein costs properly allocable to plaintiff’s advertising business; second, that plaintiff claimed the sal-, ary of an instructor for himself in the technical course, although he did not teach any subject in this course; and, third, that less instruction was given in the mixed classes *172 than that for which plaintiff billed the Veterans Administration.
We consider defendant’s first contention that a part of plaintiff’s claimed costs was attributable to his advertising business carried on from the school premises. During the time for which cost figures were furnished to the defendant, plaintiff conducted a daily radio program over a local commercial radio station. This was a separate and distinct activity from the school. Related thereto, plaintiff engaged in advertising promotions, which he conducted both from the school and from his home. Defendant seeks to allocate plaintiff’s total costs to the advertising business and to the school in direct proportion to the amounts received by plaintiff from each.
Defendant shows no justification for this. The costs allocated in part to the school, and in part to the advertising business consisted of “supplies, depreciation, rent, heat, light, advertising and administration.” On the first contract it allocates 54.33 percent of the costs to the school and 45.67 percent to advertising; on the next contract, 46.38 percent to the school, and 54.62 percent to advertising; on the next, 68.88 percent to the school, and 31.12 percent to advertising; and on the last 68.97 percent to the school, and 31.03 percent to advertising. On the technical training course it allocates 68.97 percent to it, and 31.03 percent to advertising.
Plaintiff’s advertising business was carried on partly from the school office, and partly from plaintiff’s home. Other than the office, plaintiff used no part of the school premises for his advertising business. In addition to the office, there were in the school premises six classrooms covering 3,250 square feet, and there was a laboratory or workroom with 20 work stations. To charge from 31 to 54 percent of the rent, heat, and light, and depreciation to advertising is manifestly absurd. What amount of the supplies was used in the advertising business is not shown, nor what part of the administration expenses and advertising.
So far as the proof shows, all the expense data furnished by plaintiff were properly attributable to the operation of the school.
*173 Defendant’s second contention is tbe inclusion within the cost of operating the school of an allowance for an instructor’s salary for Sawyer personally, when he did not teach the stated course, and was not qualified to do so.
It is true that plaintiff did not teach this course. He did, however, teach some of the broadcasting courses and he supervised all instruction. The trial commissioner finds that “it was common practice to allocate costs between courses where unbalanced costs might otherwise result. The allocation of allowable costs and the salary allowance for Sawyer were determined and agreed upon between plaintiff’s accountant Oswald and the Veterans Administration contracting officer Prink, for the determination of a fair and reasonable rate of tuition for the technical training course.”[3]
If the Veterans Administration’s contracting officer was aware of the allocation of a part of the time Sawyer put in as an instructor in the broadcasting courses — if he was aware that a part of it was being allocated to the technical course, there has been no misrepresentation.
The contract rate is not determined alone by costs, as is shown by the rate fixed for the third contract entered into. Plaintiff submitted cost data for the broadcasting course of $1.24 an hour, but the contract rate was fixed at 97 cents. The law required that “fair and reasonable” compensation be fixed. The rate of 65 cents for the technical course is in line with the rate fixed for this course in other schools.
We do not think defendant has shown any misrepresentation. It concedes there has been none. If there was none, the contract must stand as written.
Thirdly, defendant says that students in different courses were intermingled under one instructor, and, hence, did not receive the instruction for which the school was paid. The trial commissioner finds that “the grouping of students in mixed classes applied only to those receiving instruction in related subjects. For example, the radio technician course might combine radio technician students and advanced radio technician students. Broadcasting units and technician students could not be combined. * * *” He further finds that *174 there were “students enrolled in the basic technical course who were in attendance in the advanced technical course. This condition was brought about by reason of the fact' that some students had more experience upon enrollment in the basic training, and therefore advanced more rapidly and were transferred into the advanced technical classes, although they continued to be carried on the rolls in the basic course, and were billed accordingly, the rate of tuition being the same for both courses. The combination course would justify the advancement of students as rapidly as they could complete the necessary basic training. There is no evidence that veterans were billed at a rate higher than the training provided.” [4]
Defendant excepts to this finding, but we see no reason to alter it.
Defendant relies upon its Exhibit 16 to show that students received, at the same time, instruction as radio technicians and as radio broadcasters. We do not think this Exhibit 16 shows this. It does show that one or more students received instruction for a number of hours as radio technicians, and for a certain number of hours as radio broadcasters, but it does not show that they received instruction in these two subjects.at the same time and in the same classroom. This exhibit lists classes 20 to 25, and class 27, but we do not understand from the exhibit that “classes” means the students in a particular classroom, but, rather, means the students of a particular group in the school. This shows that group 20, designated class 20, received a certain number of hours in the radio technician course, and a certain number of hours in the radio broadcasting course. This was permissible when the school instituted the combination announcer-technician course. This combination course embraced 7 separate courses in radio broadcasting and as radio technicians. Exhibit 16, therefore, shows that some of the students in group 20 received instructions both as radio broadcasters and as radio technicians. It does not show, however, that the school billed the Veterans Administration for hours of instruction which the students did not receive.
*175 The defendant in its reply brief concedes that the State has the sole power to approve the teaching methods of the school.
On May 26, 1952, the State Director of the Division of Vocational Education and Training for the State of Oregon, had reported that the plaintiff school was found satisfactory in all respects, and he reaffirmed the prior approval of the school for veterans’ training. Later, the Veterans’ Administration wrote the State Director of Vocational Education on October 17, 1952, calling his attention to complaints that had been received about the instruction being given by the school. The State Director of Vocational Education replied on February 18, 1958, stating that the complaints were unjustified. His letter concludes:
It appears that no student was far enough behind the class [attended by him] that he did not get full instruction. It does seem that the majority of students graduating from this school are able to secure jobs in radio, as is indicated by the attached list. * * *
The Veterans’ Administration requested the Federal Bureau of Investigation to make an investigation of the school. They did so, and their report showed that they were able to find no evidence of fraud.
If the school had actually charged the Government for hours of instruction in a radio broadcasting course because of a student’s attendance in a radio technician course, this of course would have been fraudulent.
In view of all this, it seems to us that the defendant has failed to sustain its contention with regard to the mixed classes.
Plaintiff is entitled to recover. Defendant’s counterclaims are without merit and will be dismissed. Judgment will be entered in favor of plaintiff in the amount of eighteen thousand nine hundred sixty-nine dollars and eleven cents ($18,969.11).
It is so ordered.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
*176 findings of fact
Tbe court, having considered the evidence, the report of Trial Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff W. A. Sawyer and Donald M. Kneass, as partners, operated a vocational training school in Portland, Oregon, under the name of the Portland Announcing Studios, from February 1946 to June 80, 1948, and thereafter under the name of Northwest Broadcasting School. Under a dissolution agreement dated November 30, 1952, plaintiff acquired all of the right, title and interest of Donald M. Kneass in the Northwest Broadcasting School, including all of his interest in and claims to accounts receivable. Thereafter, plaintiff and Alice L. Sawyer, his wife, operated the school as equal partners.
2. The Veterans’ Administration, sometimes referred to hereinafter as “VA”, was authorized under Public Laws 16 and 846 of the 78th Congress, to pay for the instruction and training of veterans, in institutions approved as provided therein.
3. The plaintiff school was approved and licensed by the Department of Public Instruction of the State of Oregon for training in the various courses described in the contracts with the Veterans’ Administration, hereinafter referred to. The first group of veteran students was enrolled in September 1946, under contract VA-48r-Ve-34, and the training of veterans was continued in this institution up to March 30, 1953. All contracts were negotiated by the school and one or more officials of the VA Legion al Office at Portland, known as contract officers, and they were executed by the plaintiff school and the Chief of the Vocational Rehabilitation and Education Division and approved by the Chief of the Training Facilities Section of the VA Portland Regional Office.
4. The determination of fair and reasonable compensation was based upon certified cost data furnished by the plaintiff school, except in the first course of training and any new and unrelated course added thereafter, when estimated costs were used. The contract officer reviewed the cost data *177 with Sawyer or bis accountant, made whatever adjustments were considered necessary for a fair and reasonable allowance, and made his recommendations to the chief of the contract unit of the Vocational Rehabilitation and Education Division of the VA.
Contracts were negotiated on this basis for the training of veterans during 1947, 1948, 1949, and 1950. In 1949 the rates thus established became “frozen” as the customary cost of tuition by legislative enactment, public Law 266, 81st Congress (63 Stat. 631, 652-653), approved August 24,1949.
5. The plaintiff and the defendant entered into the following contracts:
(a) Contract VA-48r-ve-92, dated June 2,1947, provided for veterans’ training during the period July 1,1947 to June 30, 1948, in the basic and advanced broadcasting courses at compensation of $1.0933 per hour. The compensation was based upon plaintiff’s cost experience during the period September 1, 1946 to April 30, 1947, with a profit allowance of 10 percent of such costs. This cost data was certified to by the plaintiff and was attached to and became a part of the contract.
(b) Contract V3048V-138, dated November 22,1948, provided for veterans’ training during the period July 1,1948 to March 31, 1949, in the radio broadcasting course at compensation of $1.23 per hour, based upon cost data covering the period of operations from May 1, 1947 to April 30, 1948, which data was attached to and became a part of this contract.
(c) Contract V3048V-273 dated April 1, 1949, provided for veterans’ training during the period April 1 to November 30, 1949, at $0.97 per hour for the radio broadcasting course and $0.65 per hour for the radio technician course. The certified cost data attached to this contract covered the period from May 1,1948 to January 31,1949, for the broadcasting course at a rate of $1.24 per hour, including a 10 percent profit. Cost estimates submitted for the technical course established a rate of 97 cents per hour. These costs were adjusted by the contract officer to a “fair and reasonable” rate of $0.97 per hour for the broadcasting course, including a profit allowance of $0,146, representing 10 percent *178 of the customary charge of $1.46 to persons other than veterans, and $0.65 per hour for the technical course.
(d) Contract V3048V-359 dated November 30, 1949, provided for veterans’ training for the period December 1,1949 to October 31,1950, at the rate of $0.97 per hour for the radio broadcasting course and $0.65 per hour for the radio technician course. By supplement 2, effective August 21,1950, an advanced radio technician course was provided at the rate of $0.65 per hour.
Under Public Law 266, 81st Congress, the rates of tuition for the broadcasting course in the next preceding contract, No. 273, were established as the “customary cost of tuition”. Plowever, the plaintiff submitted cost data on its operating experience for the radio broadcasting course during the period February 1 to October 31, 1949, and for the radio technical course during the period June 13 to October 31, 1949. This data was reviewed jointly by the VA contract officer Ralph V. Prink and plaintiff’s accountant Oswald. Adjustments were made to conform with the VA format previously employed, and such costs were established to equal the hourly rates of $0.97 and $0.65 for the radio broadcasting and the technical courses of the previous contract. No part of this cost data was attached to or became any part of contract 359.
No cost data was thereafter required in negotiating the later contracts, but the rates established in contracts No. V-273 and V-359 were continued in them for the same courses as well as related courses.
(e) Contract V3048V-494, dated November 1, 1950, provided for veterans’ training during the period November 1, 1950 to October 31, 1951, at the rate of $0.97 per hour for the course in radio broadcasting and $0.65 per hour for the courses in radio technician and advanced technician. By supplement 2, effective April 15, 1951, related courses were provided in advanced radio broadcasting, control room and practice, radio sportscasting, time selling, music orientation, and radio drama at $0.97 per hour, and a television technical course at $0.65 per hour.
(f) Contract V3048V-577, dated October 19, 1951, provided for veterans’ training for the period November 1,1951 *179 to October 31,1952, in the same courses and at the same rates as provided in contract 494 above. By supplement No. 1, effective December 1,1951, a combination announcer-operator course was added. This combination course provided for payment at $0.97 per hour for instruction and training in radio broadcasting, advanced radio broadcasting, control room technique and practice, radio sportscasting, time selling, music orientation, and radio drama; and $0.65 per hour for training in the radio technician and advanced radio technician courses.
The Servicemen’s [Readjustment Act of 1944, Public Law 346, was amended by Public Law 268, 79th Congress, approved December 28, 1945, 59 Stat. 623, whereby the time limitation for the initiation of any course was increased to 4 years, instead of 2, after the discharge of the veteran or the termination of the war, whichever was later; and extended the completion of training to 9 years, instead of 7, after the termination of the war. The combination course, which had been approved by the State of Oregon, was incorporated into contract 577 in order to permit veterans to advance from one unit of this course to another without any new enrollment.
The radio broadcasting and related courses provided for 144 hours of training in each course and the technical courses 780 hours of training in each course, with maximum payments of $500 for the 780 hour courses. All full-time courses were regularly scheduled 6 hours a day, 5 days a week. Part-time courses were provided for veterans who were otherwise employed, and these were scheduled as evening classes at 2 hours a day for broadcasting courses, 3 days a week, and 3 hours a day for technical courses, 5 days a week.
Each of the contracts contained a provision that tuition rates and other costs would not exceed the charges generally made to other students pursuing the same or similar courses of instruction. Eeferences to the above contracts hereinafter will cite the suffix numbers only.
6. About October 1952, the plaintiff and the defendant entered into negotiations for a new contract to provide for veterans’ training during the year commencing November 1, 1952, hut no new contract was ever consummated. Since the *180 plaintiff bad established customary rates of tuition, the prime purpose of a new contract was to provide for new enrollments of veteran students. The plaintiff continued the instruction and training of veterans who bad enrolled prior to November 1, 1952, until they bad completed their respective courses by March 30,1953.
7. The contracts provided for payments on vouchers submitted monthly for the number of hours of instruction and training afforded each veteran student enrolled at the school, at the contract rates for the courses pursued. These vouchers were regularly submitted by the plaintiff and regularly audited and paid by the VA until about the end of May 1952. Vouchers thereafter were suspended in full because of alleged irregularities hereinafter reported.
The plaintiff continued to submit vouchers monthly from May 31, 1952 until the end of March 1953, when veteran training was completed. The plaintiff petitioned the U. S. District Court in Portland, Oregon, for a preliminary mandatory injunction to require VA to process and pay the vouchers being submitted, and upon motion of the defendant the matter was dismissed by a decision of that court October 8,1952, because of lack of jurisdiction.
The defendant concedes that the plaintiff is entitled to payment on vouchers submitted for instruction and training of veterans to March 30, 1953, subject to its counterclaim and offsets hereinafter reported.
8. In June 1951, B. S. Chambers, a contract officer, made an inspection at the plaintiff school upon a complaint of Floyd E. Hite, a veteran student, that he was not afforded full-time instruction for the evening course pursued by him. A report of this inspection was made to the contract unit supervisor June 25, 1951, wherein it was recommended that a thorough review and study of the enrollment, attendance, curricula and the application thereof, be made to determine what effect the practice of the plaintiff school might have upon the approval of its courses or the payments by VA. The evening courses were scheduled for 3-hour periods 4 to 7 and 7:30 to 10:30 p. m., the first hour being given over to a study period. Hite complained that his instruction did not start until 5:30 p. m. and that he did not report until *181 that time, but it was ascertained that he was the only student affected. Other students engaged in the study period, but Chambers found that some groups were not properly supervised by instructors. Chambers also found that a substitute instructor taught the radio broadcasting class for about 2 weeks during the absence of Don Kneass, and that classes were not commenced until 5:30 p. m. during the absence of Kneass; that class roll books were inadequate to show the course, absentees, or students who were tardy; that the advanced radio technical course appeared to be used as a device to increase the length of the radio technical course for students who failed to pass their first-class FCC examination, in that much of the training covered the same subjects as the basic course, but that Sawyer reported instruction was in an advanced manner; that it appeared VA might be paying for subjects for which the student was not enrolled.
9. On July 16, 1951, the matter was referred to the legal division with a request that a field examination be made. Field examiner Kobert P. Fariss interviewed 10 students, obtained affidavits from them, and made an examination of the school records to determine whether an audit would be justified, upon which he reported July 27, 1951.
The field examiner reported that immediate supervision was not always afforded students during their study period, but that an instructor was available at all times; that the attendance of certain students was limited by their jobs and some missed about one and one-half hours a day, but that instruction was given on Saturdays for make-up time; that certain students were attending subjects in one course and billed for another. The basic and advanced technical courses could not be distinguished definitely by the examiner, in that some students continued in subjects in the basic course after having been enrolled in the advanced course, whereas other students who had obtained a Federal Communications Commission license were advanced to other study, whereas they continued to be paid for enrollment in the old course.
The operating partners, Sawyer and Kneass, visited the office of the YA regional manager to complain of the in *182 vestigations into the conduct of the school, and they were advised that the examinations were made to determine whether proper services were rendered for which the VA was obligated to pay.
On August 3, 1951, the VA regional manager recommended to the finance officer that a complete audit be conducted, but no further action was taken at that time, and contract V-577 was executed October 19, 1951, without any question as to the propriety of the courses provided therein.
10. On April 25, 1952, Chester A. Pittman, Chief of the Training and Facilities Section of VA, wrote the local manager of the VA regional office in Portland, that complaints had been received from 4 veterans and one non-veteran student alleging that the plaintiff school had misrepresented its courses of training, that the instruction was inferior, that there was a lack of supervision during study periods, and that copies of the curricula had not been furnished the students, and recommended that payments to the school be suspended and an immediate investigation be conducted either to substantiate or refute these allegations. Mr. Pittman also wrote the State Director, Division of Vocational and Educational Training, April 28, 1952, of the matters complained of, and requested an investigation and report on the same.
On May 16, 1952, the finance officer for the local VA regional office at Portland advised the plaintiff that pending determination whether overpayments had been made, payment of vouchers had been suspended until further notice.
On May 26, 1952, O. I. Paulson, State Director, Division of Vocational Education and Training for the State of Oregon, reported, upon an investigation of each category complained of, that the plaintiff school was found satisfactory in all respects, and he affirmed the approval of the school for veterans’ training.
About the end of July 1952, Sawyer was advised that an audit would be commenced August 4, and that it would cover all years of operation of the school back to 1946. Sawyer questioned the authority of VA to audit the years *183 prior to the current contract, and on August 2, 1952, be wrote VA regional manager, “At no time have we been informed of the reason for this proposed audit.” Sawyer first requested a postponement of the proposed audit, and later refused to submit for audit the school records prior to the effective period of the current contract commencing November 1,1951.
Early in August 1952, an FBI investigation was instituted into the conduct of the school for a determination of any fraud in connection with veterans’ training at the plaintiff school. This investigation was concluded about the end of October 1952, and no evidence of fraud was found. The defendant concedes that there was no fraud, nor any intentional misrepresentation on the part of plaintiff as a basis of its counterclaim hereinafter reported.
11. On September 15, 1952, the finance officer of the VA regional office at Portland wrote the Director of VA Finance Management Service at Washington, D. C., in part:
* * * The school refused to comply with an administrative subpoena for the records served on August 22, 1952, and to date has not furnished any records. On September 2, 1952, a civil suit was filed in the District Court of the United States by the attorneys of the school for the payment of all vouchers submitted by the school and to prevent the VA from auditing any records other than those pertaining to the current contract. * * * The State Approval Agency investigated the school as a result of the complaints made and reported that they were recertifying the approval of the school.
The suit referred to was dismissed by the court October 8, 1952, for lack of jurisdiction, as reported in finding 7 herein.
On December 10, 1952, Frank M. Page, director of VA training facilities service for vocational rehabilitation and education, wrote plaintiff Sawyer in part as follows:
It is advised in your letter that pursuant to the provisions of the above law, vouchers have been submitted by your institution for payment but have been returned by the Portland Regional Office with the statement that no payment would be made, in accordance with Public Law 610. While the above law does provide that partial *184 payments of not less than 75% of the last rate paid will be made during the negotiations leading to a contract, the refusal of payment by the regional office results from a question regarding the propriety of payments heretofore made to your institution. * * *
12. On February 18, 1953, the Oregon State Director of Vocational Education made a further report to Mr. Pittman of the VA regional office at Portland, in response to a request of October 17, 1952, wherein the school’s courses were again reaffirmed as satisfactory and adequate. In reference to the merger of classes, it was found that this was a normal situation; that one class starting in July 1951, and another starting in September 1951, were merged in April 1952, but that neither group was given advanced work; that one of the instructors had left the school, and that 10 students remaining in the class did not justify the employment of another full-time instructor, so that it was logical to combine these classes in a class of 25 students. It was also reported that merged or mixed classes were continued at this school and that students expressed satisfaction at having received proper instruction. This report further stated:
It appears that no student was far enough behind the class that he did not get full instruction. It does seem that the majority of students graduating from this school are able to secure jobs in radio, as is indicated by the attached list. * * *
13. The plaintiff’s unpaid vouchers were submitted in sums totaling $19,264.90. Suspensions of $295.79 were made in the normal course of audit by the voucher examiners, leaving an amount due and unpaid in the sum of $18,969.11.
DEPENDANT’S COUNTERCLAIM
14. The defendant claims offsets against plaintiff’s unpaid vouchers and counterclaims for (1) alleged failure of the plaintiff to properly allocate certain items of its costs to other activities; (2) alleged improperly claimed expense for the services of W. A. Sawyer as an instructor in the radio technical course; and (3) the alleged improper charges for students who attended mixed classes of instruction.
*185 (1) KEAIiLOCATrOK OF COSTS
15. The Administrator of Veterans’ Affairs, in an effort to simplify and provide a uniform method of determining-fair and reasonable rates of tuition, promulgated various regulations which were distributed to all schools. These regulations set forth in detail the various items of allowable operating costs to be submitted by schools which were to serve as a basis for the determination of rates of tuition. The cost experiences of the school during a period of past operation, together with the hours of training given during such period, were used in determining the fair and reasonable hourly rate of compensation for a contract covering the subsequent period.
These regulations were assembled in a looseleaf volume, designated as the Veterans’ Administration Manual M7-5, and were amended from time to time. The regulations in effect May 28, 1947, relating to cost data are set out in part in Appendix A hereto.
16. Following the filing of the petition in this case plaintiff was required to produce his books and records from August 1946 to October 1951, covering the period in which all VA contracts were negotiated.
During the respective periods- for which cost data was furnished for the negotiation of VA contracts, it was ascertained that plaintiff was also engaged in advertising promotions in connection with his daily radio program, and that the activities in this work were carried on, in part, from his office at the school. Defendant’s VA finance auditor, Alec L. Black, decided that certain of the costs that had been submitted and agreed upon for the negotiation of VA contracts, should be properly classified as common costs, and made reallocations of a portion of these costs to plaintiff’s other activities. These reallocations were made upon the ratio of gross income between Sawyer’s advertising activities and the school.
The defendant’s auditor also eliminated the salary allowance of W. A. Sawyer from the cost data used in the determination of the tuition rate for the technical course under *186 contract V-359, because Sawyer bad not been engaged in teaching any technical course subjects during the period for which the cost data was furnished.
The amounts reallocated from the cost data for the respective periods were then divided by the number of hours of instruction given during each of such periods, to determine reductions in the hourly rates of tuition previously determined and included in the various VA contracts.
17. Certain costs upon which contracts were originally negotiated were reallocated, in part, to Sawyer’s advertising activities in the manner and amounts, as follows:

Since tuition rates became frozen under the Acts approved August 24, 1949 and July 13, 1950, as set out in finding 4, no cost data was furnished for later contracts, and the reductions above in the hourly rates under contract V-359 were applied to all instruction hours thereafter by the defendant.
*187 18. The rates of tuition specified in VA contracts did not always follow the exact rates of cost experience for the next preceding period upon which contract rates were negotiated. Thus, rates claimed by the defendant in the following tabulation vary in some instances from the reductions determined in the preceding finding. The defendant claims overcharges by reason of reductions in rates set out in the preceding finding, as follows:

19. Plaintiff Sawyer’s advertising promotions were directly connected with his daily radio program “Make Believe Ballroom” conducted over KVDQ, in Portland from 11 a. m. to 2 p. m. The radio station sold the services. The substantial portion of the promotional work required of Sawyer, aside from the broadcasting time, was conducted by him at his office in the school premises, although some work was handled from his home. The gross income realized from this work was the result of his qualifications and ability in broadcasting. The allocation of fixed charges at the school on the basis of gross income from his advertising promotions is not reasonable or justified.
The defendant contends that the VA officials had no knowledge that plaintiff Sawyer was engaged in another enterprise, and that they had not been informed that part of his expenses were allocable to his other interests. Until 1948 Sawyer paid his school expense and his advertising *188 promotion expense from the same bank account, and his checks bore the printed heading “W. A. Sawyer, Radio Promotions.” Plaintiff Sawyer also used separate stationery for his advertising promotions. The contract officer used only those expenses relating to the operation of the school which fell within the VA formula of allowable expenses in negotiating the contracts. The broadcasting conducted by Sawyer was over a Portland radio station in the same city where the VA regional office was located.
20. The allocations of costs by the defendant, as reported in finding 17 herein, were made from the cost data used in negotiating four of the early contracts. Such costs did not include all of plaintiff’s expense incurred in operation of the school, but only allowable expenses. The VA contracts were negotiated in line with what was paid other schools providing similar courses. A fair and reasonable rate of tuition was not based upon costs alone. There was no exact relationship between actual costs of operating the school and a fair and reasonable rate of tuition, although the VA considered costs of operation a primary factor. For example, in negotiating contract V-273, the plaintiff submitted cost data for the period May 1, 1948 to January 31, 1949, on its broadcasting course in the amount of $7,428.08, including a profit of $742.81, under the VA formula, on which a tuition rate of $1.24 an hour was claimed. Fair and reasonable costs were allowed in the sum of $5,458.95, amounting to $0.82 per hour, on which a profit of $0,146 was allowed, and the determination of $0.97 per hour as the contract price. The profit of $0,146 represented 10 percent of the tuition rate of $1.46 charged to students other than veterans during the same period. Thus, the reallocation of costs previously allowed for negotiating the contracts did not include all school operating expenses.
The VA finance auditor Black, who made the realloca-tions, made some verification of costs, and insofar as he had determined, all rental payments were allowed in negotiating VA contracts. In making such reallocations he did not determine or consider the space used in making such reallo-cations. Sawyer used one room as an office in the administration of his advertising activities as well as for the *189 school administration work. The classroom areas covered approximately 3,250 square feet, and consisted of 6 classrooms and one laboratory or workroom with 20 work stations. The reallocation of rent expense represents more than one-half of all the so-called common costs reallocated and reported in finding 17. The rent expense included in cost data submitted for the negotiation of the VA contracts was fair and reasonable for the conduct of the plaintiff school for the periods such cost data were submitted.
There is no satisfactory evidence which would justify the reallocation of costs for the determination of revised tuition rates claimed by the defendant.
21. The elimination of $2,256.25 as salary allowance for W. A. Sawyer from costs allocable to the technical training course given during the period June through October 1949, for the determination of the tuition rate in the following period, was improper. It was a matter of the allocation of a reasonable salary allowance for the determination of a fair and reasonable rate of tuition for the technical course. Sawyer had no specific salary but did have a drawing account. The amount of the allowance, which was based upon a rate of $475 per month, is not questioned by the defendant. It was eliminated because the salary allowance was included in the VA formula classification of “teaching”, whereas Sawyer had not taught any of the technical subjects during that period. As head of the school Sawyer supervised all instruction, counseled students in all courses, and taught some of the broadcasting subjects. Sawyer’s salary allowance could not be classified under the VA formula for administration expense, because of the limitation of allowances under this categoiy, and it was common practice to allocate costs between courses where unbalanced costs might otherwise result. The allocation of allowable costs and the salary allowance for Sawyer were determined and agreed upon between plaintiff’s accountant Oswald and the VA contract officer Prink, for the determination of a fair and reasonable rate of tuition for the technical training course. The rate thus established was $0.65 per hour of instruction.
*190 There is no satisfactory basis nor any substantial evidence which would sustain defendant’s claim of overcharges reported in finding 18 herein.
(2) — MIXED CLASSES
22. The defendant claims that the plaintiff school was not entitled to tuition payment for any hours that a veteran student attended a class other than the one in which he was first enrolled. The defendant made a study of the enrollments of veterans and attendance records for the determination of hours of instruction given in mixed classes. The plaintiff submitted no evidence to deny such mixed classes or to adjust the number of hours of attendance claimed.
The hours of attendance of mixed classes, with the amounts claimed by the defendant on vouchers submitted by. plaintiff at rates adjusted by overcharges claimed in finding 18, are summarized as follows:

23. The plaintiff school was approved January 26, 1950, by the Oregon State Superintendent of Public Instruction for instruction of a full-time, one-year combination announcer-technician course and extension of the radio technician course leading to a transmitting engineer rating. On November 14, 1951, the State Director of Education wrote Mr. Pittman of the YA Eegional Office at Portland of the approval of a combination announcer-operator course covering 7 separate courses in radio broadcasting and technical training. The announcer-operator course was incorporated and provided for veteran students in contract V-577, effective December 1, 1951, as reported in finding 5 (f). The studios of ftadio Station LGW were approved for use of *191 the plaintiff school effective September 25,1951, as adequate for 25 students in its radio broadcasting course.
The grouping of students in mixed classes applied only to those receiving instruction in related subjects. For example, the radio technician course might combine radio technician students and advanced radio technician students. Broadcasting units and technician students could not be combined. In addition to the combined technical classes composed of students who had enrolled at different times, there were other students enrolled in the basic technical course who were in attendance in the advanced technical course. This condition was brought about by reason of the fact that some students had more experience upon enrollment in the basic training, and therefore advanced more rapidly and were transferred into the advanced technical classes, although they continued to be carried on the rolls in the basie course, and were billed accordingly, the rate of tuition being the same for both courses. The combination course would justify the advancement of students as rapidly as they could complete the necessary basic training. There is no evidence that veterans were billed at a rate higher than the training provided.
24. The defendant concedes that the courses and methods of training afforded by the plaintiff school were approved by the State authorities.
The defendant has failed to show that VA students who attended the plaintiff school under VA contracts did not receive the full and adequate instruction and training in the courses in which they elected to enroll. The defendant failed to show in any substantial degree that veteran students who signed attendance records upon which vouchers were submitted for payment, failed to attend such classes or were tardy to such an extent that the hours of training received were substantially less than the hours charged in vouchers submitted for payment.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore *192 adjudged and ordered that the plaintiff recover of and from the United States the sum of eighteen thousand nine hundred sixty-nine dollars and eleven cents ($18,969.11).
It is further concluded that defendant’s counterclaims are without merit and they will be dismissed.

 157 Stat. 43; 58 Stat. 287.

 Plaintiff sues individually, although the business was actually owned and operated as a partnership.

 Finding 21.

 Finding 23.