Madden, Judge,
delivered the opinion of the court:
The plaintiff operated a trade school in Honolulu, Hawaii. It enrolled veterans of the Armed Services, and became involved in controversies with the Administrator of Veterans’ Affairs with regard to its compensation for training the veterans. In its second amended petition it asserted several claims. The Government made a motion for judgment on the pleadings, which motion this court granted with respect to all the claims except two. 142 Ct. Cl. 794. One of those two claims was abandoned by the plaintiff at the trial of this case before the commissioner.
The plaintiff’s remaining claim is that, although it made a contract with the Veterans Administration to teach veterans at the tuition rate of $0.27 per hour for one year, and $0,277 for another year, and was paid at those rates, it was entitled, under the statutes and regulations, to be paid at the *399 rate of $0.54 per hour. It sues for the additional compensation which the higher hourly rate would have produced.
The plaintiff relies upon the Act of July 13, 1950, Public Law 610, 64 Stat. 338, which is quoted in finding 22. This statute provides that a school which has had contracts with the Veterans Administration for two successive years is entitled to be paid the rate agreed to in the most recent of those contracts, and is not limited to the “fair and reasonable rate” to which an institution contracting for the first time would be limited.
The first contract which the plaintiff had with the Veterans Administration was for the period from July 5, 1950 to June 30, 1951. It fixed a rate of $0.27 per hour. The plaintiff had contended for a rate of $0.60, but the Veterans Administration had determined that $0.27 was the fair and reasonable rate. On June 1, 1951, a second contract was made, to run from July 1, 1951, to June 30, 1952. It provided for a rate of $0.277 per hour. The period covered by these two contracts is the period for which the plaintiff claims that the tuition rate should have been $0.54 per hour.
Since the plaintiff’s only two contracts fixed tuition rates of $0.27 and $0.277, the provision of Public Law 610, supra, would not seem to justify any claim to a rate higher than those figures. But, the plaintiff says, there had been prior contracts between the Veterans Administration and the Hawaii Institute of Technology, providing for a tuition rate of $0.54 per hour. The plaintiff says that it was the successor in interest to the Hawaii Institute of Technology, and was entitled to the right, which the Institute would have had, of continuing to charge the $0.54 rate.
If, in fact, the plaintiff, Honolulu Trade School, Ltd., was substantially the same entity as the Hawaii Institute of Technology, it had the right to step into its shoes and get the benefits of the pertinent provision of Public Law 610. But the evidence shows that the plaintiff had little identity with or resemblance to the Institute, although it had bought some of the equipment of the Institute and had taken over its lease. Our finding 26 summarizes the evidence, which shows that the plaintiff was a new and different school in respect to the purpose for which it was organized, its owner *400 ship, its management, its teaching staff, the courses of instruction advertised in its catalogue, and the courses actually offered to veteran trainees. The Veterans Administration was right in treating the plaintiff as a new institution, and in fixing its tuition rates on the basis of what was fair and reasonable for the training which it offered, rather than on the basis of the training which had previously been offered by another and different institution, the Hawaii Institute of Technology.
The plaintiff’s petition will be dismissed.
It is so ordered.
Durfee, Judge; Laramore, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff was incorporated on September 24, 1948, under the laws of Hawaii, to establish, maintain, and operate a trade school and to engage in other businesses. Plaintiff operated a private trade school for profit in Honolulu, Hawaii, pursuant to a trade school license granted by the Territory of Hawaii on November 18, 1948. On April 4, 1951, the name of the plaintiff corporation was changed to “Trade Associates, Ltd.”
2. In its second amended petition, plaintiff sought to recover on various claims relating to the actions of the Administrator of Veterans Affairs arising out of or connected with the training of veterans. However, the court granted defendant’s motion for judgment on the pleadings[1] with respect to all of the claims asserted by plaintiff except—
(a) Plaintiff’s claim that it is the successor in interest to the Hawaii Institute of Technology and is, under the terms of Public Law 610, entitled to a customary cost of tuition of $0.54 per hour by reason of a sequence of contracts which the Institute had with the Veterans Administration; and
(b) Plaintiff’s claim for compensation for services al- *401 legecl to have been furnished to certain veterans. This claim was abandoned at the trial.
The issue is thus limited to the single question raised in paragraphs 13 and 16.1 of plaintiff’s second amended petition, wherein plaintiff alleges that it is the successor in interest to the Hawaii Institute of Technology; that under contracts between the Institute and the Veterans Administration for the period from July 1, 1946, until August 16, 1948, the defendant paid $0.54 per hour per veteran trainee; that as a result of this sequence of contracts with its predecessor in interest and by reason of the provisions of section 2 of Public Law 610, 81st Cong., 2d Sess. (64 Stat. 336, 338), a customary cost of tuition of $0.54 per hour was established, and that plaintiff is entitled to such customary cost of tuition instead of about $0.27 per hour which is was paid under subsequent contracts entered into between it and the Veterans Administration.
3. On April 9, 1947, the Hawaii Institute of Technology was chartered as a nonprofit educational institution of higher learning, primarily as a technical college. It had three educational departments: a Department of Engineering, in which college-level engineering courses were given; a Department of Music, in which various courses in voice and music were given, and a Department of Trades, in which trade-school courses in elementary electricity, radio physics, and advanced electricty were given.
4. On May 29,1946, the Department of Public Instruction of Hawaii granted the Institute a license to operate a private trade, vocational or technical school for teaching practical electricity, radio physics, applied mathematics, advanced electricity, advanced radio, music, film screen dramatics and radio speech, radio engineering and electrical engineering. The license was renewed annually to a period ending May 29, 1949, but was surrendered by the Institute on September 20,1948.
5. During the period of its existence, the Hawaii Institute of Technology entered into only one formal written contract with the Veterans Administration. Tins contract provided for the training of disabled veterans under Public Law 16, 78th Cong., 1st Sess. (57 Stat. 43), for the period July 1, *402 1946-June 30,1947, at a rate of $0.54 per hour. In addition, however, the Institute trained nondisabled veterans under Public Law 346,78th Cong., 2d Sess. (58 Stat. 284), for which purpose no written contract was required during the period in which the Institute was approved as a school authorized to train veterans. Payment for the training of such veterans was made by a series of public vouchers, the latest of which was for the period May 1 through May 21, 1948, at the rate of $0.54 per hour.
6. Change 4 to Veterans Administration Manual M7-5 was promulgated as a regulation on May 17, 1948 (13 F.E. 2695), and required that contracts be negotiated on a fair and reasonable basis beginning July 1,1948, for the training of Public Law 346 and Public Law 16 veterans in the case of certain schools operating for profit, including those which came into existence after June 22, 1944, and which had a majority of veterans enrolled.
7. Change 9 to Veterans Administration Manual M7-5 was promulgated February 18, 1949, effective March 1, 1949 (14 F.E. 381). It carried forward the provisions of Change 4 and extended the requirements for the submission of cost data and the determination of fair and reasonable rates to all schools not in continuous operation since June 22, 1944, and to nonprofit institutions.
8. As shown by the preceding findings, the Institute was established subsequent to June 22, 1944. On July 1, 1948, veterans in training at the Institute represented a majority of the students then in training at that school.
9. On June 17, 1948, the approval of the Institute as an educational institution authorized to train veterans was withdrawn by the Territorial Department of Public Instruction. On September 20, 1948, the Institute, having previously discontinued operations as an educational institution, surrendered its license.
10. On or about August 15, 1948, the Institute sold a portion of its equipment and supplies to Eay H. Lee, Albert H. G. Chun, and Clarence W. Y. Ching and assigned to them its lease on the school premises in Honolulu where they planned to operate a trade school. On September 11, 1948, the president of the Institute wrote the Department of Pub- *403 lie Instruction, describing the sale and stating that the Institute would share the premises until October 31, 1948, when it would vacate them and move to an area adjoining the University of Hawaii for the operation of a small college training program. The letter further stated that the trade school was to open on September 27,1948, under the name of the Hawaii Institute of Technology, and that the president of the Institute was to remain in charge as principal until Mr. Lee had become qualified under the rules of the Department of Public Instruction.
On August 17, 1948, Messrs. Lee, Chun, and Ching were elected members and trustees of the Institute, and as such were the controlling trustees.
11. With the incorporation of plaintiff under the name of Honolulu Trade School, Ltd., on September 24, 1948, Mr. Lee became its president, Mr. Chun its secretary, and Mr. Ching its treasurer.
From September 20, 1948, when the Institute surrendered its license, to November 18, 1948, when plaintiff received its license as a trade school, Fred K. Frizelle, then inspector of private schools for the Department of Public Instruction, permitted Mr. Lee and his associates to continue night-school courses for nonveteran students who were enrolled as of September 20, 1948. This was done because it was considered unnecessarily harsh on the students to require a discontinuance of their training without due notice. From September 27 to December 17, 1948, plaintiff conducted night-school courses for nonveterans in automotive electricity, a course in which they had been enrolled at the Institute. During that time, plaintiff was overhauling its plant and equipment and did not conduct any day-school classes until January 1949.
12. On or about August 24, 1949, plaintiff sought a contract with the Veterans Administration for the training of veterans and claimed a customary tuition cost of $0.60 per hour. In its 1949 catalogue, plaintiff’s stated rate of tuition amounted to approximately $0.&88 per hour but in 1950 the catalogue rate was $0.60 per hour.
13. On August 24, 1949, Public Law 266, 81st Cong., 1st *404 Sess. (63 Stat. 653) was enacted. It provided in pertinent part as follows:
Readjustment Benefits: * * *: Provided further, That no part of this appropriation for education and training under title II of the Servicemen’s Readjustment Act, as amended, shall be expended subsequent to the effective date of this Act for subsistence allowance or for tuition, fees, or other charges in any of the following situations:
(1) For any veteran for a course in an institution which has been in operation for a period of less than one year immediately prior to the date of enrollment in such course unless such enrollment was prior to the date of this Act;
(2) For any course of education or training for which the educational or training institution involved has no customary cost of tuition until a fair and reasonable rate of payment for tuition, fees, or other charges for such course has been determined. In any case in which one or more contracts providing a rate or rates of tuition have been executed for two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition * * *.
In the period from August 25,1949, to September 14,1949, the Administrator of the Veterans Administration issued and sent to the regional office in Honolulu a number of operating instructions with respect to the above-quoted provisions of the Act. Veterans Administration Instruction No. 1 to Public Law 266 incorporated in substance radiograms sent to the regional office on August 25 and August 30,1949, and read in pertinent part as follows:
* * * In determining whether a school has been in operation for a period of less than one year, the effective date of operation will be the date on which a full schedule of instruction was commenced by the school to a minimum of 25 students for which the school collected tuition. The school must have been in continuous operation under substantially the same ownership and management for a full twelve months period including reasonable vacation and holiday periods and must have provided to a minimum of 25 students during that full twelve months period the course or courses of substantially the same length and character as those offered following the twelve months period.
*405 A telegram of September 2, 1949, from the Administrator to the regional offices stated that the requirement of a minimum of 25 students applied only to newly established institutions and that it was not applicable to an institution that was in continuous operation for a period of at least twelve months prior to August 24, 1949, regardless of the fact that such institution did not have a minimum of 25 students.
The instructions sent to the regional offices were further clarified by a radiogram of September 14, 1949, from the central office, stating that Instruction No. 1 did not apply to certain schools including:
D. AN institution WHICH ALTHOUGH HAVING WITHIN ONE TEAR PRIOR TO AUGUST 24 1949 MOVED TO A NEW LOCATION OR CHANGED OWNERSHIP OR MANAGEMENT REMAINED ESSENTIALLY THE SAME INSTITUTION WITH THE SAME COURSES AND PREDOMINANTLY THE SAME FACULTY AND STUDENT BODY CLN AND WHICH AS NOW OR PREVIOUSLY CONSTITUTED HAS BEEN IN EXISTENCE MORE THAN ONE YEAR
14. In applying the instructions received from the central office, the Honolulu regional office sought information from the Department of Public Instruction which supervised, regulated, and licensed private schools and was also the territorial agency which approved schools for the training of veterans.
The first inquiry made by the Veterans Administration regarding plaintiff’s school was set forth in a letter to Fred B. Frizelle, inspector of private schools for the Department of Public Instruction, under date of September 8, 1949. The Veterans Administration inquired when the school commenced operations under local regulations and also requested specific information with respect to whether—
(a) The change in ownership was merely a paper change which would not deprive the school of training and experience gathered under previous management;
(b) Substantially the same courses were offered after the change in ownership in order to definitely establish that the school retained the benefit of its experience gained under the previous management;
*406 (c) Basically the same faculty was retained;
(d) There were drastic changes in the training program, equipment, or other facilities so as to place the institution in the same status as a new school with little carry-over of prior experience; and
(e) If the school had been previously disapproved for veterans’ training, the reasons for disapproval were such as to make it inadvisable to include training experience during the disapproved period as a part of total bona fide training experience.
15. Mr. Frizelle replied by letter of September 8,1949, stating that the policy of the department called for a period of six months’ operation by a school before it was eligible for approval and that the Commissioners of the Department of Public Instruction had determined that November 18, 1948, was the date that plaintiff commenced authorized operation. His reply also stated that the department had, on June 17, 1948, withdrawn approval for the training of veterans at the Hawaii Institute of Technology, which had operated on the same premises where plaintiff’s school was located, but that the inspector had permitted the organizers of plaintiff’s school to continue night-school courses for nonveteran students who were enrolled on September 20, 1948, because it was considered unnecessarily harsh to summarily discharge the students without due notice. His letter stated, however, that the organizers of plaintiff had been notified that the matter of granting a license was solely within the power of the commissioners of the department.
16. Apparently the Veterans Administration did not consider the letter fully responsive to its inquiry and, by letter of September 15, 1949, requested more explicit information.
In his reply of September 16,1949, Mr. Frizelle stated that the Commissioners of Public Instruction had made the decision that November 18,1948, when plaintiff was licensed, was the earliest date on which it was authorized to commence bona fide operations. The letter further stated it was his responsibility to interpret the collective mind of the commissioners and that, while there were not only possibilities but probabilities for misinterpretation on his part, it was his opinion that the Honolulu Trade School was regarded *407 by the commissioners as an entirely new operation because — •
(a) Approval for veterans training at the former Hawaii Institute of Technology had been withdrawn;
(b) As an argument for the approval of the new school, its legal representative had repeatedly expressed the opinion that the Institute should never have been approved by the department;
(c) The types of courses offered at the Institute tended toward some sort of college training rather than trade training; and
(d) Only one teacher was carried over from the Institute to the new school.
His letter further stated that the units of instruction which began on July 5, 1949, at the Honolulu Trade School had enrolled the equivalent of 26 pupils on the basis of a 25-hour week.
The evidence otherwise shows that the enrollment at plaintiff’s school did not reach the equivalent of a minimum of 25 students prior to July 5,1949.
17. After the receipt of the above-described information from Mr. Frizelle, the Veterans Administration wrote plaintiff on September 22, 1949, stating that July 5,1950, was the earliest date when the Veterans Administration would be authorized to contract with plaintiff for the training of veterans because—
(a) Under applicable regulations and criteria, plaintiff’s school had been classified as a new operation; and
(b) The Department of Public Instruction had stated that July 5,1949, was the earliest date when plaintiff’s school had the equivalent of 25 or more full-time students enrolled.
18. On December 21, 1949, the superintendent of the Department of Public Instruction wrote the Veterans Administration as follows:
The above named institution was approved by the Commissioners of Public Instruction for veterans’ training under Public Law 346, as amended, as of August 25,1949.
A proviso in the Appropriations Act for the current period, referring to change of ownership of a school during the year preceding August 24, 1949, seemed to *408 preclude negotiation of a contract between the Veterans Administration and the Honolulu Trade School, so that to date no use of the facilities has been made for veterans’ training.
The Commissioners of Public Instruction, at their meeting on December 8, 1949, referred this matter to the Oahu Commissioners. The latter met on December 21, 1949, reviewed the record, and made the following findings of fact: (1) That the license of the former owner was surrendered on September 20,1948; (2) that the new license was issued on November 18, 1948; (3) that during this interim, Mr. Ray H. Lee had written for permission to — and in fact did — carry on instruction for students then enrolled; and (4) that such written permission has the same force and effect as a license under the law.
The institution was therefore found to have been in continuous operation for more than one year prior to August 24,1949.
As noted above, the previous correspondence had been exchanged between the Veterans Administration and the inspector of private schools for the Department of Public Instruction rather than with the superintendent of the department. The record does not show the circumstances under which the superintendent was prompted to write the above-quoted letter.
19. On January 4, 1950, the Veterans Administration responded to the superintendent’s letter in pertinent part as follows:
3. With reference to the application of Public Law 266 in instances where a change in ownership or management is involved, VA regulations covering same are as follows:
“Where a school has been in operation for 12 or more .months prior to August 24,1949, a change of ownership or management within the 12 months immediately preceding that date does not require the school to be considered as a new institution, provided the school remains essentially the same institution offering the same courses with predominantly the same faculty and student body.”
Since approval of individual courses and maintenance of DPI records pertaining to approved additions or discontinuances of faculty members in private schools are matters under the cognizance of your Office, information would be appreciated as to whether the Honolulu *409 Trade School is regarded as having actually continued to offer the same courses with predominantly the same faculty and student body following the change in management which occurred on September 20, 1948, as referenced in your letter of December 21,1949.
4. In connection with the above, further clarification would also be appreciated regarding a letter from your Office dated September 16, 1949, under title of “Honolulu Trade School” and signed by Mr. Fred R. Frizelle, Inspector of Private Schools. Your attention is particularly invited to paragraph 3 of said letter which expresses the opinion that the Honolulu Trade School should be classified as a new operation. In support of that conclusion, the aforementioned paragraph lists five statements of opinion, which if substantiated would indicate that following the change in school ownership and management major changes in courses and faculty occurred of such a nature as to preclude a conclusion that the same courses and predominantly the same faculty were retained. Particular note was also made of the fact that statements Nos. 3 and 5 indicate that the Auto Mechanics Course and certain other courses offered are not regarded by the Inspector of Private Schools as meeting necessary requirements of bona fide trade training. Your letter of December 21, 1949 appears to indicate that in the light of subsequent additional findings or evidence, the statements made in Mr. Frizelle’s letter of September 16,1949 are to be regarded as inapplicable, however, it is not definitely stated that such is the case. This Office would accordingly appreciate information as to which portions, if any, of the statements made in Mr. Frizelle’s letter should be considered as representing the current opinion of the DPI on the subject.
5. In summary, compliance with current YA contract regulations necessitates that an affirmative statement of opinion be submitted by the DPI in regard to the following two items before this Office can proceed with contract negotiations with the Honolulu Trade School:
a. That following the change in ownership and management, the institution continued to offer the same courses as were previously offered, with predominantly the same faculty.
b. That statements contained in the letter of September 16, 1949 signed by the Inspector of Private Schools, which indicate a negative opinion in regard to item (a) above, are no longer considered applicable by the DPI.
*410 6. In the event an affirmative decision is received from your office regarding the two above items, the VA will take immediate action to commence contract negotiations with the school.
This inquiry was answered by the superintendent of the Department of Public Instruction on January 16, 1950, as follows:
In your letter of January 4, 1950, you request additional information to ascertain whether the Honolulu Trade School meets contract requirements of Public Law 266.
Specifically, you ask whether the institution continued to offer the same courses, with predominantly the same faculty after the change in ownership.
The table attached to Mr. Frizelle’s letter of September 16, 1949, shows six courses offered and six instructors employed in May, 1948. During July and August, the teaching staff was down to two men, only one of whom continued in the employment of the new owners.
Day courses were in session in May, 1948, and again in January, 1949. During the seven months from June to December inclusive, 1948, no courses were in operation except night school classes. It was during this period, as you know, that approval for veterans’ training was withdrawn from the former owner and subsequently granted to the new owners.
We understand it is a responsibility of your office to interpret V.A. regulations and to determine whether an applicant meets the requirements for a contract. One of the requirements is the approval of the DPI. That has been granted. It is the desire of the Commissioners of Public Instruction that the Honolulu Trade School be granted a training contract. The basic or primary facts, however, concerning this or any other applicant must be the same for both the V.A. and the DPI.
The only portion of Mr. Frizelle’s letter of September 16, 1949, which is modified by subsequent action of the School Board is paragraph number 5 on page two, in which he expresses a qualitative opinion concerning the auto mechanics courses.
Inasmuch as this is a matter of opinion, it may be regarded as cancelled by the action of the Commissioners in approving the institution for veterans’ training, which action was taken following a personal inspection of the school by the Superintendent and the Chairman of the Board.
*411 20. By radiogram of January 18, 1950, the Honolulu regional office of the Veterans Administration sought instructions from the central office as to whether the negotiation of a contract with plaintiff was precluded by the terms of Public Law 266 and the instructions issued pursuant thereto, in view of the fact that plaintiff had not retained the same courses and predominantly the same faculty as the Institute. Attention was called to the fact that the school had been shut down for four months for overhauling the equipment. In a reply radiogram of January 27, 1950, the central office requested more detailed information regarding the instructional hours of the old and new courses, the exact day when the new day and night courses were in operation and the number of students in actual attendance. The record does not disclose what additional information, if any, was submitted by the regional office but as a result of the information received from the Department of Public Instruction, the regional office determined that plaintiff was a new school, that the earliest date upon which it could contract with plaintiff for the training of veterans would be July 5, 1950, and that it would be necessary to determine a fair and reasonable rate of tuition to be paid to plaintiff. The principal reasons for these determinations were:
(a) The Institute and plaintiff operated under separate licenses issued by the Territory;
(b) The Institute was a nonprofit organization, whereas plaintiff was organized for profit;
(c) The ownership and management of the respective schools were different; and
(d) The plaintiff acquired only the trade school facilities of the Institute and was operated only as a trade school, whereas the Institute had three departments, namely, engineering, music, and trades.
21. As of July 5, 1950, the Veterans Administration and plaintiff entered into a negotiated contract for the training of veterans under Public Laws 16 and 346 at a tuition rate of $0.27 per hour of instruction. The contract covered the period July 5, 1950, to June 30, 1951, but was actually executed on August 16,1950.
*412 At the time this contract was negotiated, plaintiff claimed a customary cost of tuition of $0.60 per hour, the rate stated in its catalogue at that time. This rate was in excess of the statutory limit of $500 for a full-time course for an ordinary school year. The tuition rate specified in the contract was the rate which the Veterans Administration determined as a fair and reasonable rate on the basis of cost data submitted by the plaintiff.
22. On July 13, 1950, Public Law 610, 81st Cong., 2d Sess. (64 Stat. 336), was enacted. It provided in part as follows:
For any course of education or training for which the educational or training institution involved has no customary cost of tuition, a fair and reasonable rate of payment for tuition, fees, or other charges for such course shall be determined by the Administrator. In any case in which one or more contracts providing a rate or rates of tuition have been entered into in two successive years, the rate established by the most recent contract shall be considered to be the customary cost of tuition notwithstanding the definition of “customary cost of tuition” as hereinbefore set forth. For the purpose of the preceding sentence “contract” shall include contracts under Public Law 16 (Seventy-eighth Congress, March 24, 1943), Public Law 346 (Seventy-eighth Congress, June 22, 1944), or any other agreement in writing on the basis of which tuition payments have been made from the Treasury of the United States. If the Administrator finds that any institution has no customary cost of tuition he shall forthwith fix and pay or cause to be paid a fair and reasonable rate of payment for tuition, fees, and other charges for the courses offered by such institution.
23. On June 1, 1951, plaintiff and the Veterans Administration entered into a second written contract for the training of Public Law 16 and Public Law 346 veterans. The contract covered the period from July 1, 1951, to June 30, 1952, and specified an hourly tuition rate of $0:277. This rate was determined by the Veterans Administration as a fair and reasonable rate on the basis of information submitted by the plaintiff.
24. Under the two contracts referred to above, plaintiff trained veterans from July 5, 1950, to June 15, 1952, when the school’s approval for the training of veterans was re *413 voked by the Department of Public Instruction. Thereupon, the Veterans Administration notified plaintiff that it was required to cease payments for any further training. Sometime thereafter, plaintiff discontinued operations and on October 20, 1952, surrendered its trade school license.
25. As authorized by the provisions of Public Law 610, plaintiff appealed to the Veterans Education Appeals Board alleging that the Administrator of the Veterans Administration had erred:
(a) In refusing to enter into a contract with plaintiff on or about August 25, 1949;
(b) In not providing for payment of a customary cost of tuition of $0.54 per hour in the contracts with plaintiff;
(c) In accepting the territorial withdrawal of approval of the Institute on June 17, 1948; and
(d) In finding that the plaintiff is not the same school as the Institute.
In its prayer for relief, plaintiff asked the board to find that the plaintiff had established a customary cost of tuition of $0.54 per hour and also that plaintiff should be paid compensation for the period beginning August 25, 1949, and ending July 3, 1950. On August 18, 1954, the board dismissed plaintiff’s appeal for lack of jurisdiction by holding—
(a) That the alleged errors in the period from August 25, 1949, to July 3, 1950, were not reviewable because plaintiff had no contract during that period; and
(b) That plaintiff had forfeited its right to appeal the determinations affecting the period July 5, 1950, through June 30, 1952, by entering into contracts with the Veterans Administration during that period but without reserving in such contracts the right to appeal (II VEAB Beports, p. 1155, rehearing denied p. 1161).
Although it dismissed plaintiff’s appeal for lack of jurisdiction, the board, in its opinion, discussed plaintiff’s contention that a customary cost of tuition had been established under the provisions of Public Law 266 and Public Law 610 by the operation of such provisions upon a sequence of contracts between the Hawaii Institute of Technology and the Veterans Administration. The board concluded that plaintiff’s contention should be denied on the grounds—
*414 (a) That under Public Law 266 the sequence must cover a period of two years;
(b) That eligibility to the sequence is denied to Public Law 16 contracts and to public vouchers issued in payment for tuition under Public Law 346; and
(c) That a sequence of contracts antedating both Public Law 266 and Public Law 610 cannot establish a customary cost of tuition under either Act.
26. Plaintiff operated a private trade school under a license issued by the territorial Department of Public Instruction with a portion of the facilities which had been owned by the Institute and on the same premises where the Institute had formerly operated a technical college and also taught some trade-school courses pursuant to a license issued by the territorial Department of Public Instruction. However, the plaintiff was a new and different school in respect to the purposes for which it was organized, its ownership, its management, its faculty, the courses of instruction offered in its catalogue, and the courses taught to veteran trainees. These differences are summarized as follows:
(a) The Institute was a nonprofit corporation and was organized to operate an educational institution, primarily as a technical college, and to engage in other activities for educational purposes only, whereas plaintiff was a private corporation, was organized for profit, and was incorporated for the purpose of not only operating a trade school but to engage in other businesses. In addition to its trade school, plaintiff operated a repair shop and was in the neon sign business.
(b) The officers, trustees, and persons in charge of the management and control of the Institute from the date of its organization until it sold a part of its assets to the persons who organized and operated the plaintiff’s school were Leland D. Cox, A. It. Branco, and Stella O. Cox. The officers and directors who controlled and managed the plaintiff were Ray H. Lee, Albert H. G. Chun, Irwin C. Wong, Richard D. Karr, and Clarence W. T. Ching. While Messrs. Lee, Chun, and Ching became controlling trustees of the Institute on August 17, 1948 (finding 10), this occurred after the Institute had sold them a portion of its equipment to be used *415 in the operation of a trade school and was in effect only during the temporary period that the new owners operated under the name of the Institute pending the issuance of plaintiff’s license and the approval of Mr. Lee as principal.
(c) Only one instructor who had been employed by the Institute taught at the new school organized and operated by plaintiff.
(d) The Institute had a Department of Engineering in which courses in mechanical engineering and electrical engineering were offered on a semester basis over a four-year period, and a bachelor of science degree was conferred upon the completion of each of these courses. Plaintiff did not offer these or any similar college courses. The Institute also had a Department of Music in which courses in piano, musical composition, and vocal training were offered, whereas plaintiff had no courses in music. At the time the Institute sold a part of its equipment and supplies to the organizers of plaintiff, the Institute retained all of its equipment for physics and chemistry laboratories and all of its college books with the intention of moving to a location near the University of Hawaii to continue a college training program.
(e) A comparison of the last catalogue of the Institute (1947-1948) with plaintiff’s first catalogue (1949) shows that the Institute had a Department of Trades in which it offered courses in elementary electricity, radio physics, and advanced electricity. Each of these courses was a full-time day course covering a period of 16 weeks with 25 hours of instruction per week; thus each of them was a 400-hour course. Plaintiff had no course in advanced electricity but offered one course in general electricity of 850 hours in duration. This course included 200 hours in fundamental electricity, 825 hours in house wiring, and 325 hours in motor winding. Plaintiff also had an 850-hour course in radio servicing, including 200 hours in fundamental electricity, 325 hours in fundamental radio, and 325 hours in radio servicing. The above-described courses in plaintiff’s school were day courses. It also offered night-school courses in general electricity and radio servicing, the content of which varied from its day courses.
(f) As previously stated, the Institute entered into only one formal contract with the Veterans Administration. *416 That contract was for the training of Public Law 16 veterans and covered the period from July 1, 1946, to June 30,1947. The Institute was approved only for full-time day training under its contract and the following table shows the courses it offered to veterans under that contract:

Course Length of Course

Course No. 1 Practical Electricity— 1 Semester (18 wks) 450 hrs.
Course No. 4 Advanced Electricity— 2 Semesters (36 wks) 900 hrs.
Course No. 2 Radio Physics-1 Semester (18 wks) 450 hrs.
Course No. 5 Advanced Radio_2 Semesters (36 wks) 900 hrs.
Course No. 8 Radio Engineering_2 Semesters (36 wks) 900 hrs.
Course No. 6 Music (Piano & Vocal) _ 4 Semesters (72 wks) 1800 hrs.
Course No. 7 Eilm Screen Dramatics 4 Semesters (72 wks) 1800 hrs. and Radio Speech.
In plaintiff’s first contract with the Veterans Administration for the training of Public Law 16 and Public Law 346 veterans for the period July 5, 1950, to June 30,1951, it was authorized to teach the following courses:

PL 846 (Day Program) only

Course Length of Course

1. General Electricity, Voc. level_ 900 clock hrs. (30 weeks)
3. Electrical Wiring, Voc. level- 900 ” ” (30 ” )
5. Electrical Machinery, Voc. level_ 900 ” ” (30 ” )
7. Electric Meter Servicing, Voc. level— 900 ” ” (30 ” )
9. Radio Servicing, Voc. level- 900 ” ” (30 ” )
11. Electronic Control, Voc. level_ 900 ” ” (30 ” )
13. General Electricity, Tech, level_ 1500 ” ” (50 ” )
15. Radio Servicing, Tech, level- 1500 ” ” (50 ' ” )
17. Electronic Control, Tech, level- 1500 ” ” (50 ” )
19. Electronics, Tech, level_ 2100 ” ” (70 ” )
21. Automotive, Voc. level_ 900 ” ” (30 ” )
23. Body & Pender Work, Voe. level_ 900 ” ” (30 ” )
25. Automotive Transmission, Voc. level_ 900 ” ” (30 ” )
27. Service Station, Voc. level_ 900 ” ” (30 ” )
29. Automotive, Tech, level_ 1800 ” ” (60 ” )

PL 16 (Day Program) only

1. Office Equipment, Tech, level- 1200 clock hrs. (40 weeks)
Plaintiff’s first contract with the Veterans Administration authorized plaintiff to enroll veterans in night-school courses. The Hawaii Institute of Technology had some night-school courses and also conducted a summer session, but the evidence does not show whether veterans were en *417 rolled in the night school and summer courses. The contracts show that the Institute operated on a semester basis, the regular school year beginning in September and ending in June. At the time its first contract was entered into with defendant, plaintiff operated throughout the year on a clock-hour basis with students being permitted to enroll quarterly or every 18 weeks.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and its petition is therefore dismissed.

 142 Ct. Cl. 794.