**EASTERN SCHOOL, a partnership consisting of Frank Simon, Benjamin Eizenman, Oscar Goldman, Phillip Laster and Samuel Frank**

v.

**The UNITED STATES.**

No. 229–57.

United States Court of Claims.

July 20, 1967.

Benjamin Eizenman, Douglaston, N. Y., for plaintiff.

Frances L. Nunn and Louis S. Paige, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

LARAMORE, Judge.

We are told by government counsel that this is the last of the so-called "schools" cases.[1] Thus, this opinion is our final contribution to a body of jurisprudence produced by the G.I. Bills which were enacted for the benefit of returning servicemen after World War II and the Korean War. In the typical "schools" case, the primary issue has been whether a school is entitled to a higher tuition rate for veterans' instruction than it has been allowed by the Veterans' Administration (VA). This has been largely a factual inquiry (although governed by a legal standard, i. e., "fair and reasonable compensation") which has presented difficult problems of accounting and cost allocation. There have also been subsidiary issues; for example, the proper point of first accrual of the cause of action, the meaning of the terms "customary cost of tuition" and "fair and reasonable compensation," and the presence of fraud in the presentation of claims to the VA. The present case raises both the primary issue and all the subsidiary issues on an extremely lengthy, and at times confusing, record. We note at this time our gratitude to Trial Commissioner Franklin M. Stone who prepared very thorough findings of fact after trying this case under difficult circumstances.[2] The transcript is replete with instances in which the Commissioner acted with admirable patience and judicial restraint.

---

1. E. g., National Schools v. United States, 175 Ct.Cl. 578, 361 F.2d 250 (1966); Chicago School of Automotive Trades, Inc. v. United States, 167 Ct.Cl. 106 (1964); West Coast University v. United States, 162 Ct.Cl. 310 (1963); Honolulu Trade School, Ltd. v. United States, 154 Ct.Cl. 397 (1961); Central Technical Institute v. United States, 284 F.2d 377, 151 Ct. Cl. 693 (1960); Germain School of Photography, Inc. v. United States, 281 F.2d 452, 150 Ct.Cl. 841 (1960); B. & S. Lenox Trade School, Inc. v. United States, 145 Ct.Cl. 723 (1959); Hemphill Schools, Inc. v. United States, 146 Ct.Cl. 559 (1959); Tennessee Mechanical Institute, Inc. v. United States, 145 Ct.Cl. 344 (1959); Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 142 Ct.Cl. 165 (1958); Honolulu Trade School, Ltd. v. United States, 142 Ct.Cl. 794 (1958); Massachusetts College of Pharmacy v. United States, 141 Ct.Cl. 775 (1958); Radio-Television Training Association, Inc. v. United States, 163 F.Supp. 637, 143 Ct.Cl. 416 (1958); Sawyer, d/b/a Northwest-Broadcasting School v. United States, 161 F.Supp. 610, 142 Ct.Cl. 169 (1958); Little, d/b/a Southern School of Insurance v. United States, 152 F.Supp. 84, 138 Ct.Cl. 773 (1957); Art Center School v. United States, 142 F.Supp. 916, 136 Ct.Cl. 218 (1956); Feener Technical Schools, Inc. v. United States, 141 F.Supp. 777, 136 Ct.Cl. 94 (1956); National School of Aeronautics, Inc. v. United States, 142 F. Supp. 933, 135 Ct.Cl. 343 (1956); Hemphill Schools, Inc. v. United States, 133 Ct. Cl. 462 (1955); McSweeny Trade School, Inc. v. United States, 127 F.Supp. 591, 131 Ct.Cl. 445 (1955).

2. We refer here to the conduct of one of the Eastern School partners who participated in the trial both as an attorney and witness. Perhaps because of his personal involvement in the case (in which he is effectually accused of fraud) he was somewhat overzealous in his objections and cross-examinations of witnesses.

Plaintiff is a partnership known as "Eastern School." It was organized in 1946 and commenced operation as a trade school in New York City under the name of "Eastern School of Radio & Television" in 1947. In 1949 the name of the school was abbreviated to the partnership name. On March 18, 1949, plaintiff and the VA entered into contract V3006V–292 which specified tuition rates for the following two courses for the period January 1 through December 31, 1949: Radio Technician course, $.495 per student-hour; FM and Television Technician course, $.5866 per student-hour. These tuition rates are not in issue. The dispute is over the proper rate for a course called "Radio Technology" which plaintiff offered for the first time on February 1, 1949. This course was also encompassed by the above-numbered contract in a supplemental agreement dated September 16, 1949. The tuition rate was set by the Administrator of the VA at $.50 per student-hour based upon the estimated costs of operation. On December 31, 1949, the contract and supplemental agreement expired leaving the rate for the Radio Technology course undetermined.

At this point some history is helpful. After the initial contract expired, a new rate had to be established as veterans continued to enroll in the course through 1950—in fact, until 1957. The administrative procedure had its origin in the 1944 G.I. Bill. Section 400(b) of the Servicemen's Readjustment Act of 1944, 58 Stat. 284, 289, provided as follows:

> The [VA] Administrator shall pay to the educational or training institution, for each person enrolled in full time or part time course of education or training, *the customary cost of tuition,* * * *: Provided * * * That if any such institution has no established tuition fee, or if its established tuition fee shall be found by the Administrator to be inadequate compensation to such institution for furnishing such education or training, he is authorized to provide for the payment, with respect to any such person, of such *fair and reasonable compensation* as will not exceed $500 for an ordinary school year. [Emphasis added.]

In regulations made effective July 1, 1948, the VA arbitrarily chose 30 weeks as the minimum period for the establishment of a customary tuition cost. That only covered nonprofit institutions, however. For "courses of 30 weeks or more," profit institutions were required to submit "detailed, certified financial statements showing the most recent actual cost experience of the institution for the specific courses involved" so that a "fair and reasonable compensation" could be determined. Change 4 to Manual 7–5, 38 C.F.R. § 21.530 (1949 Ed.). The regulations stated that "all expenses, except expenses for sales commissions and promotional plans, which are reasonable and necessary for the operation of the courses involved will be included in the cost statement," suggesting that any reasonably related expense would be compensable. This regulation was in effect on January 1, 1950 when plaintiff's contract, covering the preceding 11 months and providing for a rate of $.50 per student-hour, expired.

This scheme—particularly the treatment of "customary cost of tuition"—was not entirely satisfactory to either the VA or the schools, so Congress responded with two remedial bills. The first was appended to the Independent Offices Appropriation Act of 1950, 63 Stat. 631, 653 (1949). It provided that for courses subject to contract for two successive years the tuition rate would be the rate established by the most recent contract. For courses without a "customary cost," a "fair and reasonable" rate would be fixed by the VA. Administrative review was assured by the creation of a "Veterans' Tuition Appeals Board." The second bill, enacted the following year, preserved the customary cost definition of the first, changed the name of the administrative board to the "Veterans' Education Appeals Board" (VEAB), and elevated the provisions to

permanent law status. Veterans' Education and Training Amendments of 1950, 64 Stat. 336, 338–339. The history of these provisions is more thoroughly treated in Hemphill Schools, Inc. v. United States, 133 Ct.Cl. 462, 465–468 (1955).

Thus, at the time plaintiff and the VA were negotiating a new rate for the Radio Technology course for the calendar year 1950, the VA interpreted the law to mean that a prerequisite for a customary rate was a 2-year history, and that where there was no customary rate a fair and reasonable rate would have to be determined by the contracting officer. On October 13, 1950, the contracting officer determined that a rate of $.3127 per student-hour was fair and reasonable, and offered plaintiff a contract on that basis. Plaintiff objected to the rate and rejected the offer. Thereafter, on November 1, 1950, the VA renewed its offer with a rate of $.36 per student-hour. Plaintiff appealed the second determination to the VEAB on November 10. Its Notice of Appeal contended that $.533 per student-hour was the minimum fair and reasonable rate, or alternatively, that a customary cost of tuition of $.50 per student-hour should apply. A hearing followed. Almost one year later, on November 1, 1951, a VEAB hearing examiner announced his decision holding that the Radio Technology course had not acquired a customary cost of tuition because it had not been under contract for two successive years, so that a fair and reasonable tuition rate had to be determined; this he set at $.51 per student-hour. The latter determination was appealed by the Administrator of Veterans' Affairs to the Board which, on January 15, 1953, issued a final decision holding

that a fair and reasonable rate for the calendar year 1950 was $.419 per student-hour. Plaintiff was accordingly paid at the rate of $.419 for the year 1950. For the period after 1951, plaintiff was paid at the same rate because at the end of 1951, $.419 became the customary cost of tuition. Plaintiff reserved its right to contest all payments in court.

Plaintiff filed its petition[3] here on May 15, 1957, claiming the difference between the $.419 per student-hour paid by the VA for instruction of veterans enrolled in the Radio Technology course and $.533 per student-hour which is allegedly the fair and reasonable rate.[4] Alternatively, plaintiff asks for the difference between $.419 and $.50 which is allegedly the customary rate. It alleges that the VEAB decision was arbitrary, capricious, and not supported by substantial evidence; specifically it charges the Board with "arbitrarily and capriciously disregard[ing] the cost data submitted by Eastern School, and fix[ing] rates that were neither fair, reasonable nor equitable."

The government answered on September 13, 1957, and raised the statute of limitations as an affirmative defense. 28 U.S.C. § 2501 (1964 Ed.). It alleged that the portion of the claim which accrued before June 4, 1951 was time-barred. Three years later, in July 1960, the defendant obtained leave of the court to amend its answer to add three counterclaims. The first and second counterclaims were founded on the False Claims Act which provides that any person who submits or aids in making a false claim "shall forfeit and pay to the United States the sum of $2,000, and, in addi-

3. The Trial Commissioner erroneously found that June 4, 1957 was the date of filing. On that day plaintiff filed its first amended petition in printed form. The second filing was required because the original petition was typewritten; rule 1(c) permits the filing of typewritten petitions on condition that 25 printed copies be filed within 20 days thereafter.

4. The students for whom the higher tuition rate is claimed received benefits under the

1944 G.I. Bill which was Public Law 346, 58 Stat. 284 (1944). They are referred to as "346" students. Also involved in this case are so-called "550" students, although no claim is made on their behalf. They are Korean War veterans who received benefits under Public Law 550, 66 Stat. 663 (1952). Their testimony is relevant in connection with defendant's second counterclaim.

tion, double the amount of the damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit". 31 U.S.C. § 231 (1964 Ed.). The first counterclaim is based on the language: "Any person * * * who shall make * * * any claim upon or against the government of the United States * * * knowing such claim to be false, fictitious, or fraudulent * *." It relates to "346" students [5] whose tuition plaintiff received directly from the VA after it submitted vouchers showing the attendance of each student. The second counterclaim is based on the language: "Any person * * * who, for the purpose of obtaining or aiding to obtain the payment or approval of [a false claim] * * * causes to be made or used, any false * * * certificate * * *." It relates to "550" students [6] whose tuition plaintiff received from the students after the VA paid them; plaintiff prepared the attendance records which the students submitted to the VA. The third counterclaim is predicated on section 266 of Public Law 550 and section 1503 of 28 U.S.C. (1964 Ed.), which would allegedly entitle the government to recover overpayments of veterans' benefits. An additional counterclaim was raised in the trial. It is based on section 2514 of 28 U.S.C. (1964 Ed.) which provides for the forfeiture of the entire claim of any claimant who practices fraud in the prosecution of the claim.

We address ourselves first to the statute of limitations problem, then to the merits of plaintiff's claim for a higher tuition rate, and finally to defendant's counterclaims.

## I. STATUTE OF LIMITATIONS

Section 2501 of 28 U.S.C. (1964 Ed.) bars a claim in this court "unless the petition thereon is filed within six years after such claim first accrues." Recently the court reviewed in detail the application of the "first accrual" language to breach claims and disputes clause claims

under the standard government contract. Nager Electric Co. v. United States, 368 F.2d 847, 177 Ct.Cl. —— (1966). We held that the right of action on disputes arising under the contract (disputes clause claims) first accrues when the administrative action is final, and that a like result should obtain for "a 'breach claim' under a contract which has also spawned 'disputes-type' items in litigation * * because of the principle that one indivisible contract normally gives rise only to one cause of action." 368 F.2d, at 865. The Supreme Court adopted this approach as to disputes clause claims in Crown Coat Front Co. v. United States, 386 U.S. 503, 510, 87 S.Ct. 1177, 18 L. Ed.2d 256 (1967); it did not reach the question of the time of first accrual for breach claims.

This case is not here for review of an administrative decision rendered under a disputes clause. See 41 U.S.C. §§ 321–322 (1964 Ed.). Nor is it here as a breach claim. So Nager Electric might be thought to have no application. However, the reasoning used there is extremely instructive in establishing what formula should be applied in this case. The starting point in Nager Electric was the general rule that first accrual should be "the time when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." 368 F.2d, at 851. It was further stated that "[t]he prerequisite that the plaintiff must be able lawfully to demand payment goes back to the early days of this court." Ibid. Both points were supported by numerous citations. There then followed an analysis of the rule in contract cases before the mandatory disputes clause era and a discussion of aberrations caused by agreements, special statutes, and other factors. The thread running through this analysis is "that there is no single inexorable principle of limitations for contract litigation but that the individual terms, conditions, and practices must always be

---

**5.** See n. 4, supra.

**6.** Ibid.

studied." 368 F.2d, at 852–853. From there the court branched off into its analysis of the reason for a special rule of "first accrual" where the judicial claim cannot ripen until the administrative remedy is exhausted. We stop short of that inquiry here, confining ourselves to a review of the contracting situation between plaintiff and the VA which should indicate the proper course for determination of the time of first accrual.

It should be recalled that the contract covering the Radio Technology course terminated on December 31, 1949, but that plaintiff continued to instruct veterans thereafter. The VA advised plaintiff on September 6, 1950 that it would pay an "interim [tuition] rate" of $.30 per student-hour (as compared with $.50 under the old contract). The letter assured plaintiff that payment of the interim rate would be "without prejudice to [its] * * * right * * * to receive such rate as may be established in the final contract." The interim rate was boosted to $.375 on November 13, 1950, after plaintiff filed its appeal of the $.36 offer. At this time, plaintiff was instructed to submit vouchers setting forth only the total number of hours of instruction furnished, without any designation of individual students or the number of hours furnished to them. These instructions also advised plaintiff it would ultimately have to prepare an itemized schedule listing each veteran and all applicable fees, to be submitted after determination of a final rate. In a letter dated January 30, 1951, the VA continued this bulk billing arrangement. On July 17, 1952, the VA reversed its position on the bulk billing method; it notified plaintiff it would be given two months to prepare final vouchers in detail and with respect to each veteran for the period of interim payments, and that henceforth interim payments would be made only on the basis of detailed billings for each veteran. Then, on September 26, 1952, the VA sent another letter specifying the procedure for interim payments with regard to each of the following periods: January 1 to December 31, 1950; January 1 to April 30, 1951; from May 1, 1951 on. This letter also defined and set forth procedures covering attendance, absences, and make-up instruction—procedures which had theretofore been undetermined.

■ This fact pattern suggests to us that plaintiff was not in a position to demand payment of a higher rate until July 17, 1952, at the earliest, and probably September 26, 1952. It appears that from 1950 on, both plaintiff and the VA anticipated that there would be a contract which would establish a rate to apply retroactively and prospectively and which would govern the procedure for determining the number of compensable hours of instruction. In fact, the parties were never able to agree on a formal contract and the VA had to unilaterally establish the procedure for substantiating tuition claims for veteran students, and perhaps more importantly, standards for reasonable absences. This it did on September 26, 1952. Before that date plaintiff could perhaps have demanded payment of a higher rate and sued upon any refusal, but that would have been inconsistent with the arrangement contemplated by the contracting parties. For all plaintiff knew, the VA might have ultimately given it everything it desired; at least it was not unreasonable for plaintiff to negotiate for two years, hoping that the final arrangements would be satisfactory. In short, we think this is a case in which the familiar principle that first accrual occurs only upon completion of performance should bend to "the individual terms, conditions, and practices" of the particular situation, which point here to September 26, 1952 "as the time when all events * * * occurred to fix the Government's alleged liability". Nager Electric Co., supra, 368 F.2d, at 851. Plaintiff's entire claim is therefore timely.

The government directs our attention to Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 142 Ct. Cl. 165 (1958), a rather similar schools case in which the court held a claim time-

barred for not being brought within six years of the performance of the services. A tolling argument was there rejected on the grounds that the administrative appeal proceeding was not mandatory. 161 F.Supp., at 411, 142 Ct.Cl., at 168: A more recent case referred to us by Congress, is admittedly in conflict with Empire Institute. Chicago School of Automotive Trades, Inc. v. United States, 167 Ct.Cl. 106 (1964). In the view we take of the present case, however, it is not necessary for us to resolve this conflict and determine whether the cause of action accrued at the time the administrative process was completed. We are simply holding that on the facts of this case, with particular reference to the negotiating posture of the parties, plaintiff could not have practically demanded payment of the higher rate until the VA unilaterally established the procedure for itemizing vouchers and the attendance formula.

The Trial Commissioner found the decision of the VEAB (holding (1) that a tuition rate of $.419 per student-hour for the Radio Technology course was fair and reasonable, and (2) that the estimated annual instructional hours for the course should be 148,720 hours) was "arbitrary, capricious, erroneous, and not supported by substantial evidence." On the basis of the administrative record and the record made in a trial *de novo* before him, he determined that the fair and reasonable rate of tuition for the period commencing January 1, 1950 was $.494 per student-hour and that the proper annual instructional hour figure was 145,090. Plaintiff now urges adoption of these findings as modified by the addition of $.024 per student-hour for the allocable cost of supervisory personnel. Defendant argues that the Board decision should not be overturned or modified because its conclusions were supported by the record made before it.[7] This is really an argument that the administrative decision is entitled to finality.[8]

---

7. For purposes of negotiating a new tuition rate for the calendar year 1950, plaintiff gave the VA a cost statement for the period November 1, 1948 to October 31, 1949. Actually, this cost statement only covered the 9-month period of the Radio Technology course's life, i. e., February 1 to October 31, 1949. The negotiations continued into November 1950, making it possible for plaintiff to submit a more recent cost statement for the period November 1, 1949 to October 31, 1950. The Hearing Examiner refused to consider this later cost statement. In reviewing the Examiner and fixing a new rate, the VEAB did consider the later cost statement as well as the earlier. Both statements are now before the court as parts of the administrative record.

8. Since the issue has been raised, we think it is appropriate, to say something about the scope of judicial review in these cases. The Commissioner has ostensibly applied the familiar substantial evidence test here, thereby suggesting perhaps that he thought the VEAB decision was entitled to finality under Wunderlich Act standards. See 41 U.S.C. §§ 321–322 (1964 Ed.). His decision to conduct a *de novo* trial to build a new record was not inconsistent with administrative finality because review on a *de novo* record was accepted procedure in this court in its pre-*Bianchi* era. See United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed. 2d 652 (1963). Actually there are significant differences between the government contract administrative process and the VA's administrative process, which may suggest a broader scope of review in the latter area.

The VEAB was first established in 1949 and was made a permanent fixture of the VA the following year. 63 Stat. 631, 653 (1949); 64 Stat. 336, 338 (1950). Both statutes gave contractors the right to Board review of the Administrator's decisions and subjected Board proceedings to the provisions of sections 5 and 11 of the Administrative Procedure Act. It was also provided that Board decisions "shall constitute the final administrative determination." The combination of section 10 of the Administrative Procedure Act, which limits the scope of judicial review of administrative decisions, and the "final administrative determination" language of the VA statutes, might suggest that VEAB decisions should be entitled to finality with judicial review limited to the now familiar standard. See United States v. Utah Construction & Mining Co., 384 U.S. 394, 86 S.Ct. 1545 (1966). First, regarding the application of the Ad-

We think the Commissioner correctly found that the Board decision was not supported by substantial evidence on the whole record before it, so that if the decision were entitled to finality, it could be vacated. We also think the Commissioner properly made findings on the tuition rate. This would be true whether or not the Board decision is final. If it is not final, there is, of course, no problem; if it is final, the court may determine the proper rate after concluding that the original decision was not supported by substantial evidence, because it would be futile to suspend proceedings for administrative redetermination by a board that no longer exists. See United States v. Utah Construction & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed. 2d 642 (1966). We adopt all the Commissioner's findings on the tuition rate except those on supervisory personnel.

The tuition rate per student-hour is determined by totaling expenditures on each of the following items and dividing each total by the number of instructional hours over which it should be spread: Teaching Personnel, Consumable Supplies, Operation and Maintenance, Taxes and Insurance, Administrative Expenses, Depreciation, Rent and Advertising. This produces the correct allocation per student-hour of each cost item. A profit allowance of one-ninth of the total of all costs per student-hour is then added to produce the tuition rate. We briefly review each of the contested components below.

The Board determined that the estimated enrollment in the Radio Technology Course should be 148,720 annual instructional hours for the calendar year 1950. It will be remembered that this figure is the divisor for the purpose of allocating aggregate costs. It arrived at this figure by arbitrarily assuming an enrollment of 44 students in each session (78.57% of the maximum capacity of 56 permitted by the City of New York building regulations) and multiplying this by the 65 hours of instruction per week given in three sessions (44 students per session x 65 hours per week x 52 weeks per year). The Board noted in passing that this estimate was consistent with the actual experience shown by the cost statement for the first 10 months of 1950. The Trial Commissioner adjusted the Board's figure to take account of the six national holidays which fall in each year. This gives an annual instructional hour figure of 145,090 which both parties accept and which we adopt.

Under VA regulations, plaintiff was entitled to be compensated through the tuition rate for the "[a]ctual cost of teaching and related personnel at reasonable salaries," the latter category (related personnel) to include "personnel essential to the teaching function such as laboratory supply room attendants and clerical personnel assisting teachers in the preparation of instructional material and records." 38 C.F.R. § 21.530(b) (1) (1949 Ed.). It appears to be undisputed that generally a tuition rate should in-

---

ministrative Procedure Act, it is important to note that we are not sitting as a court of appeals to review the actions of an administrative body; this case is before us under our Tucker Act jurisdiction. Plaintiff might also have been entitled to review of the rate determination in another Federal court, but it chose instead to sue the United States as the other party to the transaction. See Hemphill Schools, Inc. v. United States, 133 Ct.Cl. 462 (1955). There is no suggestion in the statutes that the standards of the Administrative Procedure Act should apply to another system of review—although that would not be an unreasonable result. Second, with respect to the "final administra-

tive determination" language, it should be noted this is very different language from that used in the standard disputes clause which provides the "decision [of the contracting officer] shall be final and conclusive upon the parties hereto." We conclude the statute does no more than state that a Board decision marks the end of the administrative process. Of course the Board decision is entitled to some weight, perhaps great weight, and it may be desirable as a matter of policy to defer to the Board's expertise. However, that kind of policy decision is very different from the mandate in the standard government contract's disputes clause.

clude teachers', laboratory assistants', and supervisors' salaries as the cost of "teaching personnel." The question here is whether plaintiff has proved that its employees qualify.

With regard to the instructors, allocation of their cost to each student-hour of instruction depends on the student-teacher ratio—the lower the ratio, the higher the cost. The Board projected an enrollment of 44 students per session and determined that two teachers would be adequate. This produced a ratio of 22 to 1. We have reviewed the evidence which was before the Board and conclude that the proper ratio is 18 to 1. The Radio Technology course had two aspects; students were taught theory in lecture classes and practice in laboratory classes. The breakdown by hours was 75 percent lecture classes and 25 percent laboratory classes. The capacity of the laboratory was 14 students. This information alone might support the 22 to 1 figure (as well as some higher or lower ratio). There is other evidence, however, indicating 22 to 1 is too high. The VA, in presenting its case to both the Hearing Examiner and the Board on appeal, asked for an 18 to 1 ratio. The plaintiff's cost data for the period from November 1, 1949 through October 31, 1950, showed that the actual experience for this period was a 12.8 to 1 ratio. This information suggests that the proper ratio is something less than 22 to 1. The 18 to 1 ratio is supported by the evidence and is in fact a figure satisfactory to both plaintiff and the VA, if not to government counsel.

The student-teacher ratio is applied to the projected student enrollment and the annual rate of compensation per teacher to compute the total figure for "teachers' salaries." In its computation of the cost of instruction, the Board used its 22 to 1 ratio and the salary figures stated in the union contracts ($5,565 per annum for day teachers; $3,339 per annum for night teachers). Plaintiff objects to this computation or two grounds. It objects to the ratio and contends the salary figures are understated because instruction

was furnished 52 weeks per year which necessitated substitute teachers for the period the permanent teachers were on vacation. The evidence is clear that all instructors were entitled to three weeks vacation with pay so it must be concluded that the Board's total figures understated the true salary cost. We adopt the Commissioner's method of computation which multiplies 2⅖ teachers for each session (the 18:1 ratio applied to 44 students per session) times the annual compensation per teacher as augmented by a vacation allowance.

Plaintiff asks for a similar adjustment (to take account of annual leave) for its laboratory assistants' expense. It also urges that the figure allowed by the Board should be substantially adjusted upward to reflect the cost of a laboratory assistant or stock room man for every session. The Board apparently determined that the figure used in plaintiff's cost statement for the period November 1, 1949 to October 30, 1950, was correct and decided accordingly. That figure most likely takes account of the annual leave cost; this follows from the fact that plaintiff's prior cost statement accounted for the effect of annual leave on these personnel. We agree with the Commissioner that plaintiff has not shown the Board figure to be unsupported by substantial evidence. We also note plaintiff has not been able to prove that its present figure is more accurate than the Board's.

As noted earlier, the regulations' definition of "teaching personnel" is sufficiently broad to comprehend supervisory personnel. Defendant would concede this on the condition that the supervisors be "necessary to the performance of the instructional function in the particular course involved." The Board held that plaintiff failed to prove the necessity of three supervisors to the teaching of the Radio Technology course, and our Commissioner has agreed. We conclude plaintiff should prevail on this point, and that its allocation is reasonable. The supervisors in issue were charged with reviewing the conduct of

teachers, preparing forms required by the New York State Department of Education, assuring that tests were properly given, reviewing the progress of students, and guaranteeing that laboratory check sheets and experiments had been completed and properly graded. These functions are closely related to instruction, and indeed necessary for instruction. It is true plaintiff's proof on this point both before the Board and in the *de novo* trial is primarily the self-serving testimony of one of the partners. It is also true that one of the supervisors was another partner. However, it seems reasonable to conclude (at least as to the two unrelated supervisors) that the supervisors were necessary to the business, absent some showing to the contrary. Plaintiff has proved this much. It is possible that their functions could also be described as administrative functions, but in either case they would be compensable (though perhaps in the tuition rate of another course). Another factor that persuades us the supervisors' salaries should be included in the "teaching personnel" cost is that plaintiff included similar supervisory costs in other VA contracts. As for the amounts, the cost statement for the November 1, 1949 to October 31, 1950 period shows three supervisors with total annual wages of $26,820. Plaintiff allocated roughly 12 percent of this figure to the Radio Technology course, reasoning that the allocation should be based on each course's share of the total number of instructional hours for the school. This produced a total supervisory cost figure of $3,312 which includes vacation pay. This allocation seems quite reasonable. It is the same formula as that used to allocate administrative expenses, and defendant has not challenged the administrative expense allocation.

All salaries were subject to a 4.6 percent payroll tax. There is no dispute that this was part of the salary cost to plaintiff and may be included in the "Teaching Personnel" cost. Thus, the correct computation of the "Teaching Personnel" item is as follows: instruc-

tors' salaries, $37,375; laboratory assistants' salaries, $2,709.25; supervisors' salaries, $3,312; payroll tax (4.6% of $43,396.25), $1,996.23; total "Teaching Personnel," $45,392.48; "Teaching Personnel" per student-hour ($45,392.48 divided by 145,090 hours), $.3129.

The Commissioner also made findings with respect to operation and maintenance, depreciation, and rent expenses. In each case he found that plaintiff had not shown that the Board's decision was unsupported by substantial evidence, and he refused to consider offers of proof which supported allocation theories not presented to the Board. He did, however, modify the Board's computations to take account of the changed student enrollment figure. Neither plaintiff nor defendant contest the findings at this stage. We adopt the Commissioner's computations for this reason and omit references to the substantial evidence test and the refusal to consider offers of proof.

■ The addition of the supervisors' salaries and the profit allowance on them (⅙) to "Teaching Personnel" brings the "fair and reasonable" tuition rate to $.5209 per student-hour. This is more than the $.50 per student-hour claimed in the alternative by plaintiff as the "customary cost of tuition." No doubt plaintiff would be happy to abandon this alternative now, and the defendant would like us to adopt it. We think it is quite clear from the statutory scheme, however, that plaintiff had no "customary cost of tuition" in 1950 since the course was only 11 months old, so the VA and the Board quite properly sought to establish the "fair and reasonable" rate which we have redetermined.

### III. DEFENDANT'S COUNTER-CLAIMS

#### (A) First Counterclaim— "346" Students

Defendant's first counterclaim alleges that Frank Simon, Benjamin Eizenman and their partnership, Eastern School, prepared false vouchers and submitted

them to the VA to get tuition payments for "346" students. Specifically, defendant alleges that plaintiff knowingly overstated the attendance of eight veterans which resulted in the overpayment of 213.5 hours, or $89.33. Under the False Claims Act, 31 U.S.C. § 231 (1964 Ed.), proof of this allegation would entitle defendant to $178.66 (double the $89.33 damage suffered) plus $10,000 (five forfeitures of $2,000 each, representing the five vouchers or claims which falsely reported the attendance of the eight veterans). The Commissioner found on the basis of the testimony of the eight veterans and other evidence that there was "clear and convincing" evidence that five of the eight were absent for longer periods than their attendance vouchers indicated and that Frank Simon and Benjamin Eizenman had knowledge of this fact so that the vouchers "constituted false and fraudulent claims for payment presented to and against an agency of the United States."

■ We agree with the Commissioner that defendant has the burden to prove by "clear and convincing" evidence that plaintiff knew the claims in question here were false, fictitious, or fraudulent. See Klein v. United States, 285 F.2d 778, 786, 152 Ct.Cl. 8, 23 (1961); Kamen Soap Products Co. v. United States, 124 F.Supp. 608, 620, 129 Ct.Cl. 619, 642 (1954); United States v. Grannis, 172 F.2d 507 (4th Cir.), cert. denied, 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727 (1949); McCormick, Evidence § 320 (1954). And we are mindful of the fact that the familiar presumption of correctness of a Commissioner's findings has additional force here because of the obvious importance of demeanor and credibility which cannot be effectively reviewed in a "cold, printed record." See Note, Appellate Review in the Federal Courts of Findings Requiring More than a Preponderance of the Evidence, 60 Harv.L.Rev. 111, 112 (1946). However, we do not adopt all his ultimate findings on the first coun-

terclaim because we differ somewhat on the proper application of the burden of proof test; the defendant has not persuaded us by clear and convincing evidence that plaintiff or its partners or agents knowingly submitted false claims.

At most, there is clear and convincing evidence that five of the eight veterans were absent for periods when they were marked present, and that four of the five who were absent informed Simon, Eizenman or an instructor that they would be absent. As the sketches of the five veterans below will show, these facts do not prove fraud.[9] Equally consistent with a fraud explanation of the facts is the explanation that plaintiff's attendance system may have been deficient, or its record-keeping practices were possibly inaccurate or sloppy. To prove fraud in these circumstances defendant would have to show that Simon or Eizenman or another person in the management group not only "knew" these students were absent, but also wilfully decided to mark them present on the VA-required vouchers, or that there was a policy to misreport, and that Simon or Eizenman made no effort to be certain that students whom they knew were absent would be reported absent. The evidence required for this showing might be the testimony of an employee regarding his instructions from Simon or Eizenman or the testimony of students that a promise was made to mark them present. The record on the "346" students is barren of such evidence.

For example, the Commissioner found that Anthony P. Papevies was absent at least seven days in July 1955 although the voucher submitted to the VA showed him absent only two days. Papevies testified that he recalled vacationing in Pennsylvania for two full weeks during that July. It is reasonable to assume that his recollection is reliable absent proof to the contrary. He also testified that he told either Simon or Eizenmen that he planned to be absent, and that

---

9. We adopt the Commissioner's findings regarding the three other veterans without comment; the parties have not excepted to them.

one of them assured him it would be "all right." Papevies did not, however, explain what "all right" meant. The VA rules permitted students 30 days of annual leave; for all we know, Simon or Eizenman meant it was "all right" on the assumption he had not yet taken his annual allotment. In short, we adopt the Commissioner's findings that Papevies was absent seven days in July 1955, but we do not find clear and convincing evidence of fraud.

The unreported absence of Maurice E. DeCuir for 12 days in August 1954 is proved not only by his testimony but also by stamped airline ticket envelopes included in the record on an offer of proof.[10] There is conflicting evidence in the form of an attendance card apparently signed by DeCuir on every school day in August 1954. He did not resolve the conflict by his testimony. He was unresponsive when asked on redirect examination whether he ever completed an attendance card for an extended period on one occasion. The only way to reconcile the conflict is to assume that the testimony regarding his trip and the corroboration provided by the airline ticket envelopes should be entitled to considerably more weight than the attendance card which could very easily have been signed at one time. This, of course, does not show fraud on plaintiff's part without a statement by the witness that plaintiff or its agents gave him the card in blank and told him they would complete it falsely. Nor does DeCuir's testimony that "someone" in the office told him it would be all right to "take the vacation" prove fraud. There is no evidence that he was not entitled to as much vacation as he took. We adopt the Commissioner's

finding that DeCuir was absent for 12 days in August 1954, but do not find clear and convincing evidence of fraud on plaintiff's part.

The evidence relating to Louis Fishman's alleged absence for 11 days in July 1955 is again recollection testimony which plaintiff seeks to discredit by referring to a written statement which Fishman gave to the FBI in 1958. He apparently said then that he vacationed in June or July 1955. This statement was not introduced in evidence; it would not serve plaintiff's purpose if it were. We adopt the Commissioner's finding that he was absent for 11 school days in July 1955, but do not find fraud. Here there is not even any testimony that Simon or Eizenman told him it would be all right to be away; he only testified that he told Eizenman and an instructor. We cannot infer from this and the fact that he was reported absent for only two days that plaintiff truly had knowledge of the absences. The clear and convincing standard requires something more than a showing that one student of hundreds stopped a school officer in the hall to report a prospective absence.

Much the same can be said of the evidence relating to Rudolph Stone's attendance. He was reported absent for two days in each of July and August 1955, but testified that he was on vacation the last week in July and the first week in August—a total of eight school days. There is no reason to doubt his recollection. Of greater significance to the fraud issue, he testified that he told some unidentified representative of the school that he was going away and this person said "we will take care of it in

---

10. After DeCuir was excused as a witness, *defendant evidently talked with him and found out that he had duplicate airplane tickets and a stamped ticket envelope, which would corroborate his testimony.* Defendant requested that DeCuir be allowed to testify again because of this "newly discovered evidence." The Commissioner took the testimony on an offer of proof, but after the trial decided to allow the new testimony in evidence. We

agree with his ruling, noting that this and a number of similar evidence problems could have been avoided had the government prepared more thoroughly. Many of the government witnesses indicated on cross-examination that they might have some records which could corroborate their testimony. Evidently the government never attempted to get this information, thereby making proof of its case more difficult.

the office." This suggests fraud, but that is all it does. For clear and convincing evidence we would expect an identification of the representative or at least an assurance that it was a representative. Then also, to determine the meaning of the words, the setting in which they were spoken, is important. The government might have made its proof if it had examined Stone on the surrounding circumstances, or if it had developed through Stone some evidence tying in plaintiff's conduct to the allowance by the VA of a full subsistence check for the period in which the unreported absences occurred. Instead the government simply stopped its examination after establishing the absence and the recollection of the conversation. We adopt the Commissioner's finding on the 8-day absence, but we do not find fraud.

The evidence relating to fraud in the preparation and submission of the vouchers for Joseph Steinberg is perhaps the strongest of all. He testified that after informing both Simon and Eizenman of vacation plans for July 1954 and 1955 he was told: "Go ahead. Don't worry about it." Again, there is the problem of the intended meaning of that advice. Objectively, there is nothing in these words to indicate an intent to falsify records. Subjectively, however, they may well permit the inference that Simon and Eizenman promised Steinberg that the school would not report him absent. This inference is supported by Steinberg's testimony that he got his $60 per month subsistence allowance for both periods of absence, that he knew the VA only allowed 30 days of leave before deducting $2 for each day of absence, and that he had had a substantial number of absences early in 1955 which probably used up his 30 days. But this inference does not meet the requirements of clear and convincing evidence. As with Stone, the defendant might have been able to prove its case had it conducted a more thorough examination of its witness. It

should have examined Steinberg on the circumstances of his discussions with Simon and Eizenman and not stopped after having Steinberg testify that he was absent and that he was told not to worry. There is a hint of fraud in the record before us, but the facts are also consistent with an innocent interpretation. We adopt the Commissioner's finding that Steinberg was absent for seven days in July of both 1954 and 1955; we do not find fraud.

### (B)   Second Counterclaim—"550" Students

Defendant's second counterclaim alleges that Frank Simon, Benjamin Eizenman and their partnership, Eastern School, prepared false vouchers and submitted them to the VA on behalf of veterans entitled to benefits under P.L. 550.[11] Specifically, defendant alleges that plaintiff knowingly overstated the attendance of nine veterans on 12 different certificates which resulted in overpayments to the veterans. Under the False Claims Act, 31 U.S.C. § 231 (1964 Ed.) proof of this allegation, i. e., that plaintiff "made or used, * * * [a] false * * * certificate * * * for the purpose of * * * aiding to obtain the payment [of a false claim]," would entitle defendant to $24,000 (12 forfeitures of $2,000 each, representing the 12 certificates which falsely reported the attendance of the nine veterans). The Commissioner found on the basis of the testimony of the nine veterans and three teachers who taught "550" students that five of the nine were absent for longer periods than the certificates of training indicated, and that Frank Simon and Benjamin Eizenman had knowledge of this fact, so that the certificates "constituted false and fraudulent claims for payment presented to and against an agency of the United States."

We think there is clear and convincing evidence that plaintiff knowingly prepared false claims with respect to Jose

---

11. Under Public Law 550, 66 Stat. 663 (1952), it will be recalled that schools sent vouchers certifying veterans' attendance to the VA, which then paid benefits directly to the veterans who, in turn, paid the schools the "fair and reasonable" tuition.

Rosa-Garcia and Jose A. Huertos-Ramos, and we adopt the Commissioner's findings with respect to them. For the same reasons that we did not find clear and convincing evidence of a violation of the False Claims Act in our consideration of the first counterclaim, we do not find any violation with respect to the seven other witnesses. We do, however, adopt the Commissioner's findings regarding the attendance of the other witnesses, omitting his conclusions on the fraud issue.

Jose Rosa-Garcia testified that he went to Puerto Rico on March 18, 1956 after his mother died, and stayed there until April 6. This is corroborated by a death certificate. When he returned, he discussed his absence with Simon. On direct examination Rosa-Garcia could not recall what Simon said to him. He recalled only that he was given an attendance card to sign in blank and directed to return to class. On cross-examination, he was quite firm in declaring that he never told Simon to mark him present nor did Simon promise that he would be marked present. In fact, the school only marked him absent for four days in March 1956, whereas the evidence is clear he was absent at least 12 days. If this were all, we would have to conclude as we did with respect to the first counterclaim, that although the evidence shows Rosa-Garcia was absent 12 days in March 1956, it does not show fraud. The balance is shifted by the testimony of the teachers, notably that of Pablo R. Rancier who was Rosa-Garcia's instructor. Rancier, Meyer Glikin, and Ralph Paniague, all testified that they were told by Simon and Eizenman in staff meetings and in written memoranda to stop marking a student absent after two consecutive absences. Accompanying those instructions was an explanation that teachers should do this "to give [students] a break * * * because of sickness or something, that they have been absent, and the check [from the VA] would be short."[12] Rancier stated that the entries he left blank were later completed by someone in the office to show the student present. Glikin and Paniague said Simon or Eisenman told them on several occasions to mark some students present who had been absent beyond the 2-day period. Rancier recalled this was a continuous practice from 1952 to 1957.

Plaintiff does not deny it instructed teachers to leave the attendance record blank after two days of absence. It explains this as a procedure designed to put pressure on veterans to keep good attendance—i. e., the school administration was quickly put on notice of prolonged absences and able to deal with the problem. In addition, Simon and Eizenman both testified that they never instructed the teachers to report students present who were absent. Plaintiff attempted to discredit the contrary testimony of the teachers by eliciting testimony that the teachers were not happy with working conditions and moved to a competitor school. Where there is such a conflict, we think great weight should be given to the Trial Commissioner's conclusions. He had the opportunity to observe the witnesses' demeanor and evaluate their credibility. In this instance, he concluded that the teachers were telling the truth. We adopt this conclusion.

Plaintiff asserts in its exceptions to the Commissioner's findings that Rancier was Rosa-Garcia's teacher and that Rosa-Garcia told Rancier on March 18, 1956, of his mother's death and his intention to go to Puerto Rico that day for her funeral. From this, plaintiff infers that Rancier "out of sympathy for the student for the hardship which caused the absence, marked the student present when he was actually absent." Plaintiff finds support for this inference in Paniague's testimony that he occasionally marked students present who were absent without the office's approval. This inference falls with the proof that Rosa-Garcia told Simon about the absence. Although there is no proof that Simon prepared

---

12. Tr., p. 846.

Rosa-Garcia's certificate of training, he knew about the instructions to teachers regarding absences and must have known that either Rancier or someone in the office (who, of course, would be under Simon's and Eizenman's control) would follow the procedure and mark Rosa-Garcia present. These are not facts which are equally consistent with a clerical error interpretation. There is clear and convincing evidence that plaintiff instructed the teachers to falsify attendance, that Rancier followed this policy on many occasions, that he knew of Rosa-Garcia's absence, that Simon (who with Eizenman was responsible for the policy) knew of the absence, and that the certificate of training did not report the absence. Plaintiff cannot avoid responsibility for the false certificate in these circumstances. We adopt the Commissioner's finding that there is clear and convincing proof of a violation of the False Claims Act so that defendant is entitled to recover from plaintiff Eastern School, Frank Simon, and Benjamin Eizenman, jointly and severally, $2,000 as a forfeiture.

The evidence relating to Jose A. Huertos-Ramos is similar, although plaintiff comes close to establishing that the proof of the unreported absence is less than clear and convincing. We think defendant has met its burden, however. Huertos-Ramos testified that some time in February 1956 he went to Puerto Rico to visit his mother who was very ill. His recollection was that he was absent school about 15 days.[13] The certificate of training reported four absences. He further testified that on his return he wrote the school officials and then went to see them because he was worried that he would get a "short check" from the VA for the period he was away. He "explained the situation" to Simon (or possibly Eizenman, but definitely one of them) who replied, "don't worry about it." His worries were later assuaged by the check from the VA which was only "three days short." Plaintiff cross-examined Huertos-Ramos quite closely on his recollection about the trip to Puerto Rico. It was able to get him to say that he travelled to Puerto Rico frequently in the mid and late '50s and that his mother had a prolonged illness. This casts doubt on his ability to testify with certainty in 1963 that he went to Puerto Rico in February 1956. In this situation, it is best to defer to the trier of fact who was best situated to evaluate the credibility of the witness. The Commissioner found the defendant had proved Huertos-Ramos was absent during this period; we adopt this conclusion noting that the witness' recollection of the absence is supported by his memory of a storm in Puerto Rico, which delayed his return, as well as the circumstances of the trip—i. e., he responded to a letter from his mother.

The fraud is proved by adding the fact that Rancier was Huertos-Ramos' teacher. This is enough to tie together the fact of absence, Simon's knowledge of

13. An FBI agent testified at the trial that he prepared a written statement on the basis of an interview he had in 1958 with Huertos-Ramos who refused to sign the statement because "he couldn't remember the exact date" of his absence. The Commissioner ruled that the defendant did not have to produce the statement or show it to plaintiff because it was unsigned and not approved. Citing Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963), which was decided subsequent to the trial, plaintiff argues now that under the Jencks Act, 18 U.S.C. § 3500 (1964 Ed.), plaintiff was entitled to see the statement, that statements producible under the Jencks Act include not only "signed" statements, but also any statements "otherwise adopted or approved," § 3500(e) (1), and that by reason of defendant's failure to produce the statement in question, the testimony of Huertos-Ramos should be stricken. We think the Commissioner made the correct ruling. It should be noted first that the Jencks Act applies only to criminal proceedings by its express terms. § 3500(a). This is neither a criminal nor a quasi-criminal proceeding as the discussion of double jeopardy in the text, infra, makes clear. Second, it should be emphasized that Huertos-Ramos did not sign the statement or otherwise approve the contents.

that fact, and the school's policy to report students present who were absent. As we concluded with respect to Rosa-Garcia, the cumulative effect of these facts meets the clear and convincing proof requirement; they are not equally consistent with a clerical error interpretation. It is no answer to the foregoing that Huertos-Ramos was entitled to 30 days of annual leave and that he had probably not used it in February or that his mother's illness might have been a reason for an excused absence. Absences must be reported regardless of the fact that they may be allowable. We adopt the Commissioner's finding that there is clear and convincing proof of a violation of the False Claims Act so that defendant is entitled to recover from plaintiff Eastern School, Frank Simon, and Benjamin Eizenman, jointly and severally, $2,000 as a forfeiture.

The evidence with respect to Gabino Ocasio-Santiago, Marcos Diaz, and Enrique Nieves-Maldonado proves absences of 17 days (July 1956), 29 days (14 in March, 15 in April 1956), and 15 days (4 in December 1956, 11 in January 1957), respectively, which considerably exceed the number reported. Like the evidence relating to the "346" students in the first counterclaim, however, the evidence proving these absences does not prove fraud. At most it proves that Simon or Eizenman knew of the absences and told the students not to worry. There is no tie-in with any of the teachers. Accordingly, we adopt the Commissioner's findings that these students were absent, but omit his references to fraud.

### (C)   Third Counterclaim & Claim of Forfeiture

The third counterclaim is founded on 28 U.S.C. § 1503 (1964 Ed.) which gives this court jurisdiction to give judgments upon set-offs. The set-off is allegedly warranted by those provisions of the G.I. Bill which allow the recovery of overpayments to veterans. The defendant neither submitted evidence of damages nor requested findings of fact with re-

spect to this counterclaim, so we do not discuss it.

▮ Defendant does press here a new counterclaim based on 28 U.S.C. § 2514 (1964 Ed.) which provides for the forfeiture to the United States of a claim "by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof." Proof of this fraud would work a forfeiture of plaintiff's entire claim. Plaintiff defends against this counterclaim on the ground that it was apprised of it for the first time when it received defendant's answering brief in November 1966. It cites this court's present rule 14(b) (9 (b) in the prior edition) which provides that "in all averments (1) of fraud (including a plea by the United States that the plaintiff has practiced or attempted to practice fraud within the meaning of 28 U.S.C. § 2514) * * * the circumstances constituting fraud * * * shall be stated with particularity." In reviewing the transcript, we observed that on February 9, 1963, the last day of the trial, government counsel moved to amend the government's answer and counterclaim to conform to the proof. Section 2514 was the subject matter of the motion. So, plaintiff cannot claim complete surprise. It is correct, however, that defendant failed to follow the rule which sets out the prerequisite to maintaining a section 2514 counterclaim. We, therefore, reject this counterclaim without reaching the merits.

### (D)   Plaintiff's Defenses

Plaintiff argues that a judgment for defendant under the False Claims Act exposes Simon and Eizenman to double jeopardy under the Fifth Amendment because they have already been tried and acquitted in a criminal action as to each item of alleged fraud. Allied to this is a second argument that the doctrines of res judicata or collateral estoppel should apply because of the prior acquittal. In considering these arguments, we assume plaintiff is correct that the criminal action involved the same facts.

The double jeopardy argument is disposed of by United States ex rel. Marcus v. Hess, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), and its successor, Rex Trailer Co. v. United States, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149 (1956). In those cases, the Court held that the predecessor provisions to the False Claims Act were civil and remedial, not criminal, so that persons subject to them who had already been criminally prosecuted were not put in double jeopardy. The Court noted that the $2,000 "forfeit and pay" provision and double damages sanction might have the appearance of being punitive, 317 U.S., at 551, 63 S.Ct. 379, but that in fact they were appropriate measures of damages in civil actions of this kind—i. e., Congress did not exceed its bounds in arbitrarily setting these indices of full restitution.

■ Unless the False Claims Act can be considered criminal in nature, the doctrines of res judicata and collateral estoppel can have no application. See Murray & Sorenson, Inc. v. United States, 207 F.2d 119, 122, 42 A.L.R.2d 628 (1st Cir. 1953). This follows from differences in the burden of proof. Acquittal in a criminal action means no more than that the prosecution was not able to prove guilt beyond reasonable doubt. It does not mean that the prosecution could not have obtained a conviction had it only to prove guilt by clear and convincing evidence or a preponderance. The Supreme Court cases show that the False Claims Act is not criminal in nature. Accordingly, we hold that the acquittal of Simon and Eizenman in the criminal proceeding can have no effect in this case.

## CONCLUSION

■ In conclusion, we hold that plaintiff's claim was timely filed, that the "fair and reasonable" rate of tuition for the Radio Technology course is $.5209 per student-hour which takes account of adjustments to the "Teaching Personnel" cost category including the allowance of supervisors' salaries, and that plaintiff is liable for two forfeitures of $2,000 each under the False Claims Act.[14]

Judgment shall be entered for plaintiff in the amount of the difference between the rate of $.521 per student-hour and the $.419 determined by the Board, times 1,042,900.3 hours,[15] or $106,375.83, which amount shall be reduced by the $4,000 judgment on defendant's second counterclaim. The government's first and third counterclaims, as well as its counterclaim based on 28 U.S.C. § 2514, shall be dismissed.

NICHOLS, Judge (concurring):

I concur in the result and in all of the court's able opinion except the part relating to 28 U.S.C. § 2514. As to that, I reach the same destination by a different road. I agree that the counterclaim should be rejected.

As I read section 2514, it was intended to forfeit any claim if the claimant practiced fraud in the prosecution thereof, not only before the Congress or the Executive branch, but before this court also. Clearly, therefore, the failure to plead section 2514 at the outset would not bar its invocation if the fraud occurred after the pleadings had closed. Clearly too the falsity, though begun earlier, continues after the pleadings have closed if the claimant in testimony or othewise continues to assert what is actually not

14. The defendant might be entitled to its "costs of suit" under the False Claims Act. No allowance is made for this item, however, because the defendant has not offered any evidence concerning these costs, nor has it made any claim therefor.

15. The parties agree the vouchers show that plaintiff provided a total of 1,043,019.3 compensable hours of instruction to "346" students enrolled in the Radio Technology course. (This is the only subject matter of the affirmative claim.) The government asserts in its first counterclaim, which relates to "346" students, that plaintiff over-reported attendance for 213.5 hours. We have adopted the Commissioner's findings that the plaintiff over-reported 119.0 hours. Accordingly, we have reduced the number of compensable hours to 1,042,900.3.

true. The Government's theory invoking section 2514 I read as implying this. I believe that in circumstances which need not be spelled out here, but which may at any time occur, it would be the duty of this court to invoke section 2514 *sua sponte,* whatever the position of the Government's law officers.

We said in Pewee Coal Co. v. United States, 161 F.Supp. 952, 958, 142 Ct.Cl. 796, 806 (1958), cert. denied 359 U.S. 912, 79 S.Ct. 588, 3 L.Ed.2d 574 (1959):

> The sanction of forfeiture under this statutory provision is harsh, and it can be invoked only when the Government assumes the burden of pleading and proving that a claimant has corruptly practiced or attempted to practice fraud. * * *

The Government there had disclaimed any reliance on section 2514 and we stated that the applicability of that section was not before us.

The fine record of the Department of Justice in our lifetimes may make it unthinkable to us that Government counsel would themselves connive in a fraud on the Government, but this is an old statute, R.S. 1086, and in the historic view it is all too thinkable that this could occur. Hence, again, the silence or belated activity of defendant's counsel does not necessarily mean that we have no duty to perform in the premises. I cannot, therefore, justify my concurrence wholly on the lateness of the hour when the defendant here first invoked section 2514.

We held in Little v. United States, 152 F.Supp. 84, 138 Ct.Cl. 773 (1957) (another veteran's training school case) that fraud relating to some items of a multi-item claim forfeits all of them under section 2514, but the falsity was widespread and general. Here a few days tuition of two students only, out of thousands, is all the false claim that remains after the conscientious screening of the commissioner, and of the court. To apply the *Little* case would be to elevate logic over reason and experience.

Such drastic forfeitures are apparently provided for elsewhere in our law, e. g.,

19 U.S.C. § 1592. I think the Congress intended to rely on the Executive branch and on the courts to apply all such provisions in a reasonable manner related to the apparent purpose of the legislation, not just to its literal language. Church of the Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). To hold the entire claim forfeit on account of falsity in two items out of thousands would do more to discourage honest persons from doing business with the United States than it would to deter false claims. If reasonably construed, section 2514 is not harsh, though certainly drastic. I think the findings, as modified by the court, fail to disclose anything to justify a more sweeping ultimate finding that plaintiff has corruptly practiced fraud with respect to the proof of the claim generally. Hence, I would restrict the forfeiture to the two items shown to be false.

SKELTON, Judge (concurring in part and dissenting in part):

I concur in all of the well-written and exhaustive majority opinion, except that portion which finds the plaintiff guilty of fraud with reference to the filing of claims of the two "550" students, Jose Rosa-Garcia and Jose A. Huertos-Ramos. In my opinion, the defendant failed to show by clear and convincing evidence that plaintiff knowingly prepared false claims for these students with the intent to defraud the government.

In the case of Jose Rosa-Garcia, the evidence shows that he was absent from school twelve days, but he was marked absent for only four days by "someone" (unknown) at the school. When he returned, he discussed his absence with Simon, but neither of them mentioned whether he would be marked present or absent. He signed an attendance card, in blank, and returned to class. The majority opinion states that these facts alone do not show fraud. The opinion then establishes fraud by the testimony of the three disgruntled school teachers who had left plaintiff's employ and had gone to a competing school after diffi-

culties at plaintiff's institution. The teachers testified that Simon and Eizenman had instructed them to stop marking a student absent after two consecutive absences, and that on several occasions Simon and Eizenman told them to mark "some students" (they were not identified) present who had been absent beyond the two-day period. The two-day absence rule was explained by plaintiff so it would have notice of absences and could put pressure on the students to remedy the situation. Plaintiff denied it ever told the teachers to mark a student present when he was absent. None of the teachers prepared the attendance record of Jose Rosa-Garcia and no one knows who did. The majority opinion states that although there is no proof that Simon prepared his certificate of training, he "must have known" that either teacher Rancier or someone in the office (under Simon's and Eizenman's control) would follow the "procedure" and mark him present. From this, the majority finds plaintiff guilty of fraud. In my opinion, this evidence falls far short of that required to show fraud. It does not show by clear and convincing evidence that plaintiff knowingly prepared a false attendance record for this student, nor that plaintiff knowingly prepared a false certificate or claim for him for presentment to the government with intent to defraud. This is not a conspiracy case and it is not enough for the government to show alleged general acts of misconduct on the part of the plaintiff. It is accused here of a specific act of fraud with reference to a specific student. The fraud has not been proven as required by law.

The Jose A. Huertos-Ramos case is similar to the Jose Rosa-Garcia case, only weaker on the fraud question. He said he was absent fifteen days, but he was marked absent four days. On his return he talked to Simon or Eizenman about his absence. He testified he went to Puerto Rico often in the mid and late 1950's because of the prolonged illness of his mother. There was considerable doubt that he could testify with certainty in 1963 that he went to Puerto Rico in February 1956. No one knows who prepared his attendance record. The majority opinion once again relies on the fact that Rancier was Huertos-Ramos' teacher to establish fraud. It says that this ties together the absence, Simon's knowledge thereof, and the school's policy to report students present who were absent, and the cumulative effect of all of this is that proof of fraud as to this particular student is shown by clear and convincing evidence. In my opinion, it is neither clear nor convincing and is not the kind of evidence required to show fraud in this case. The teacher did not prepare the attendance record of this student, and neither did Simon or Eizenman. The teacher was not told to mark this student present when he was absent. All that we have is suspicion and inference on top of inference. This is not enough. There is no clear and convincing evidence that plaintiff knowingly prepared a false attendance record for this student or knowingly prepared a false certificate or claim to be presented to the government for or by this student with the intent to defraud.

Accordingly, I would hold that defendant has failed to prove by clear and convincing evidence a violation by plaintiff of the False Claims Act and is not entitled to recover anything from plaintiff on its second counterclaim.